No. 66,921

STATE OF KANSAS, *Appellee,* v. HIEU D. TRAN, *Appellant.*
(847 P.2d 680)

Opinion filed February 12, 1993.

*Rebecca E. Woodman,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the briefs for appellant.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Jeffrey E. Goering,* assistant district attorney, *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is a criminal evidence case. The primary issue concerns the admission of evidence of gang characteristics and gang association through both expert and lay testimony. Secondary issues concern the trial court's: (1) failure to instruct on the lesser included offense of involuntary manslaughter; (2) certification of the minor defendant for prosecution as an adult; and (3) imposing the maximum sentence.

Hieu D. Tran (Hieu) was convicted by a jury of second-degree murder (K.S.A. 21-3402). Our jurisdiction is based upon a transfer from the Court of Appeals under K.S.A. 20-3018(c) and upon K.S.A. 1992 Supp. 22-3601(b)(1). The standard of review is abuse of trial court discretion. *State v. Griffin,* 246 Kan. 320, 326, 787 P.2d 701 (1990).

We find no error and affirm.

## Facts

During a December evening in 1990, the Tran brothers, Toan Q. and Toan (the victim), and their girlfriends met at a skating rink in Wichita. Hieu (the defendant) had arrived at the rink with a group of friends. Jimmy Nguyen, one of Hieu's friends, testified that sometime before the group left for the rink, Tam, another friend, showed the group a small black .22 caliber handgun. Tam had loaded the gun in front of the group and had it with him when the group left to go skating.

Several witnesses saw Hieu at the skating rink. Hieu was told by management to leave the rink because he had broken the rules. He changed his appearance by putting on a green trench coat and wire rim glasses and undoing his ponytail before returning to the rink. One of the floor guards on duty that night testified that "[q]uite a few" individuals inside the rink wore green trench coats. When Jimmy Nguyen arrived at the rink he put his shoes and those of a friend in a locker. Toan Q. later opened the same locker to store his shoes and those of his girlfriend. Toan Q. removed Jimmy's shoes in order to insert his own, whereupon Jimmy accused Toan Q. of stealing. Toan Q. told Jimmy that Jimmy's shoes were beside the locker. Toan Q. testified that Jimmy, surrounded by Jimmy's friends, began pointing at him and swearing in Vietnamese. The argument continued. Toan Q. informed Jimmy he had a gun in the car. Jimmy threw a punch at the Tran brothers.

A security officer and a floor guard broke up the fight. After investigating the incident, the security officer arrested Jimmy for assault and battery. The Tran brothers indicated that they wanted to follow through with Jimmy's prosecution. A patron at the rink testified that he was in the skate shop after the fight and saw someone there with a green trench coat in a group of Vietnamese males. The patron heard people in the group say "they were gonna get even and they knew how they were gonna do it."

The Tran brothers and their girlfriends, in leaving the skating rink, headed towards the parking lot. Kevin Nguyen followed and stated, "[Y]ou fought my friend, why don't you fight me?" Kevin claimed that one of the Tran brothers took a swing at him. Toan Q. kept on walking because he was afraid "something might happen." A girlfriend of one of the Trans testified that she, the other girl, and the Trans were confronted by "a whole bunch of guys." She said she heard Kevin say to Toan Q., " 'Why'd you mess with my brother? You mess with him, you mess with me.' " She also heard talk about a gun. The owner of the rink saw the confrontation between Kevin and one of the Trans and stepped in to diffuse the situation.

Toan Q. said he heard someone say, " 'Where's the piece, where's the piece?' " Toan Q. testified that someone hit him twice in the face and "before I knew anything, everybody was jumping

on top of me and I didn't know where my brother was." He stated that six to eight people were fighting him and that he did not see Hieu in any of the groups of people he fought. The victim's girlfriend testified that she heard one of the people in the group say to Toan Q., " '[D]o you wanna fight one of me or do you wanna fight gang?' "

According to Toan Q.'s girlfriend, as many as 8 or 10 people were fighting the Trans (4 or 5 on Toan and 4 or 5 on Toan Q.). The security officer testified that he saw 35 to 50 Vietnamese in a parking lot encirclement. He testified he heard a shot and saw a flash of light. The floor guard told the rink owner that someone had been shot. The owner noticed people "going everywhere," including someone next to the fence in a drab green jacket.

Toan died from a head wound. Dr. Peterson, who performed the autopsy, removed the lead slug and gave it to the authorities. A spent cartridge case was discovered at the crime scene. The next day the rink owner found a gun in the snow near the fence where he had seen the person in the green jacket. There were no footprints in the snow in that area. The bullet removed from the victim was so distorted the police examiner was unable to conclusively determine that it came from the gun found in the snow. The examiner did testify that the empty cartridge case found in the parking lot was fired from the gun he had examined.

Thirteen-year-old Charlie Pham testified that he watched the fight in the parking lot. Charlie saw Hieu in the circle of people, pull a gun from inside the green trench coat and point it at Toan's head. Charlie heard one shot fired and stated that Hieu had shot Toan. Jon Corbin, Charlie's friend, testified that Charlie was asked after the shooting if he knew who had done it. Charlie replied, "Yeah, Hieu."

The next day, Hieu, who was not yet a suspect in the shooting, was interviewed by Detective Morris. Hieu denied any involvement in the events surrounding the shooting. Hieu told Detective Morris that he: (1) arrived at the rink at approximately 6:00 p.m.; (2) had seen the disturbance by the lockers; and (3) took off his skates around 9:00 p.m. and waited for his friends to finish skating. Detective Morris also indicated that an organization called the C Boys or Seal Boys was discussed because the group was

associated with North High School and Hieu had attended that school.

Hieu was arrested a week later. After his arrest, Hieu initialed a *Miranda* form, indicating that he read and understood his rights. Hieu stated he saw people leaving the skating rink and he figured there was going to be a fight outside. He told the detectives he had heard that someone had been shot. Hieu said that he had been wearing a jean jacket, black shirt, and jeans and that his hair was tied back. A second interview commenced about seven or eight minutes later. Hieu admitted being kicked out of the skating rink and that he returned after altering his appearance. He also admitted he was in the parking lot at the time of the fight but denied being a participant. Hieu said he heard a shot but he thought a police officer was shooting.

Hieu explained that Tam had the gun with him when they went to the rink. He claimed that later that evening Tam told him someone named Hung had thrown the gun away. A detective testified that Hieu commented that the shooting must have been an accident because Vietnamese people do not shoot other Vietnamese people. The detective said Hieu speculated that with all the people running around someone must have been bumped, which caused the gun to go off. Hieu, with tears in his eyes, said, "I didn't mean to shoot him." Hieu told the detective that he put his hands in the pockets of the green trench coat and happened to find a gun, which he pulled out and pointed to scare the persons on the ground fighting. Hieu stated that he was bumped and the gun went off. Hieu said that he threw the gun as hard as he could.

The trial court granted the State's motion for prosecution as an adult. Prior to trial, Hieu's counsel filed a motion in limine seeking to preclude, among other things, the admission of evidence regarding Hieu's alleged gang involvement. The motion was denied. Defense counsel at trial entered a continuing objection to the admission of any gang evidence.

### Expert Gang Testimony-Gang Characteristics and Association

Officer Brad Carey, the gang intelligence officer for the Wichita Police Special Community Action Team (SCAT), testified of his training and experience concerning gangs. The trial judge rec-

ognized Officer Carey as an expert in the area of gangs. Officer Carey explained that one of his duties was to document and maintain a roster of Wichita gang members. The officer stated that he used the Los Angeles police gang unit criteria for determining whether an individual was a member of a gang. Carey testified regarding the Los Angeles criteria:

"A. One [of the criteria] would be if an individual admits gang membership. Two would be if a very reliable informant tells me that this person is a gang member. If a person wears gang type clothing or would change his dress style to affect a certain neighborhood. If the person is arrested in the association of other gang members during the commission of a gang crime. If an unreliable informant or one who has not been tested before, that person tells me that this person is a gang member, I try to corroborate that information with other criteria to prove that this person is a gang member or whether he is not a gang member. If a person is continually in the association or within the group of gang members but does not fit the other criteria, I list him as a gang associate and not a gang member."

Additionally, Officer Carey affirmed that he used the Los Angeles criteria in compiling a membership list for the "Local Boys" gang. He described the physical characteristics of the Local Boys and the characteristics of Asian gangs. Among other things, Officer Carey testified that Asian gangs "always try to instill fear and intimidation in the community, and they do this by—they'll always retaliate against the person or the—a family, if it may be a family, with phone calls, with death threats, driving by the house." Carey noted that Asian gangs are likely to retaliate and that the means of retaliation could include violence. Officer Carey identified Hieu from a photo lineup as a member of the Local Boys gang. Carey's identification was based upon observations of Hieu associating with other gang members on two occasions and on information provided by a reliable informant. At trial, a variety of witnesses testified regarding a local group or gang known of as the Local Boys.

## Hieu's Contentions

Hieu claims he was denied a fair trial by the admission of gang characteristics and purported gang associations. Hieu reasons that a gang is not simply a group of kids who hang out together. According to Hieu, the term gang, in its current usage, connotes opprobrious implications. The use of the word "gang" takes on

a sinister meaning when it is associated with activities. Hieu argues that in attempting to associate the crime charged with gang activity, the State employed, through expert and other (mainly hearsay) testimony, an overly broad use of the term gang. The use encompassed virtually any association of minority youth, whether or not participating in criminal activity. Hieu asserts that such a definition of the term gang, in the context of a criminal prosecution, violates the right to freely associate which is protected by the First and Fourteenth Amendments to the United States Constitution.

Hieu asserts that *Lanzetta v. New Jersey,* 306 U.S. 451, 83 L. Ed. 888, 59 S. Ct. 618 (1939), struck down a statute which referenced the term gang because it was conceptually overbroad. *Lanzetta* is not controlling. *Lanzetta* focused solely upon statutory interpretation. No "gang" statute is being applied in the case at bar. Kansas has not adopted "gang" legislation.

Hieu argues that Officer Carey was not qualified to testify as an expert on street gangs because his opinions were not based upon viewpoints generally accepted within the field. Hieu claims that Officer Carey's testimony used theories regarding gang identity and behavior and attempted to apply the theories to the "Local Boys" to suggest that the shooting was gang related. According to Hieu, Officer Carey was operating as a behavioral scientist. Consequently, the basis of Carey's opinions must be generally accepted as reliable within the field. Hieu refers to an extensive study by researchers at the University of Chicago which deals with gangs as a juvenile problem in our society. Spergel, Youth Gangs Problem and Response: A Review of the Literature, Part 1, National Youth Gang Suppression and Intervention Project, Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, and School of Social Service Administration, University of Chicago (April 1990).

The inference Hieu draws from the University of Chicago study appears to be that Officer Carey's conclusions must be flawed because the whole field of gang study is fraught with definitional difficulty. According to Hieu, the Los Angeles Police Department criteria are overbroad. In support of this claim he references an incident in which Los Angeles police conducted a major gang sweep and close to half of those arrested were not gang members.

See Burrell, *Gang Evidence; Issues for Criminal Defense*, 30 Santa Clara L. Rev. 739, 742-43 (1990). Hieu asserts, without citation to the record, that Officer Carey believed that *"any* association among minority youth, whether participating in illegal activity or not, constitutes a 'gang.' " Carey labeled Hieu a gang member after two separate observations of involvement in activities with known gang members. Carey also testified that more than one of the criteria must be present to label an individual as a gang member. Carey placed Hieu on the gang list because of the observations and because of a statement by a reliable informant. Hieu refutes the use of the informant as reliance upon "impermissible hearsay." Hieu also argues that appearance (*i.e.,* clothing, hair color) cannot be used to conclusively establish gang membership and that Carey's testimony regarding general gang behavior was not directly related to Hieu.

Hieu compares his case with *State v. Clements,* 244 Kan. 411, 770 P.2d 447 (1989). In *Clements,* a psychologist testifying as an expert on child sexual abuse presented testimony of the characteristics of the typical child sexual abuser. The State was permitted to tie this testimony to Clements in closing argument. On cross-examination, the psychologist stated that his sexual abuser comments did not specifically relate to Clements and that he had never met or talked to Clements. We held that the expert's testimony was not relevant to whether Clements committed the crime. It created an impermissible inference of guilt and did not assist the jury in determining if the child was sexually abused by Clements. 244 Kan. at 421. Evidence of gang association or characteristics may only be admitted if relevant. Relevance is present in the case at bar. Hieu's reliance on *Clements* is misplaced.

## The State's Contentions

The State asserts that Officer Carey was properly qualified as an expert under K.S.A. 60-456(b) and, consequently, the admission of his testimony was not an abuse of discretion. Officer Carey attended a week-long seminar hosted by the Los Angeles County Sheriff's Department that dealt specifically with gangs. He was instructed on techniques to identify gang crimes and gang members, as well as on ways to combat gang violence. He attended a Drug Enforcement Administration seminar that included a four-

hour block of instruction concerning gangs. In addition, he had: (1) read a book dealing specifically with Asian gang crimes; (2) read numerous police magazine articles on gang violence; (3) viewed 12 videotapes involving gang activity; (4) spoken at 15 to 20 professional gatherings on the topic of gangs; (5) contact with other gang control units across the country and frequently traded information with them.

The State asserts that Officer Carey's testimony was helpful to the jury and was properly admitted. We agree. Expert testimony can explain a defendant's actions which might otherwise appear difficult to comprehend. As the Wichita gang intelligence officer, Carey is required to gather information on Wichita gangs and gang-related activity. Officer Carey, in his capacity as gang intelligence officer for SCAT, has accumulated knowledge and information unique to the field of gangs and gang activity. Carey was able to provide the jury with information not generally known regarding gang characteristics and indicia of membership in a specific gang. Carey's testimony had the tendency to prove material facts relating to the events surrounding Toan's death. See *Clements,* 244 Kan. at 418.

The admission of expert testimony is governed by K.S.A. 60-456(b). A general framework for examining an expert's qualifications appears in *State v. McClain,* 216 Kan. 602, 606, 533 P.2d 1277 (1975). The expert must be qualified to impart to the jury knowledge within the scope of the expert's special skill and experience that is otherwise unavailable to the jury from other sources. The trial court did not abuse its discretion when it determined that Officer Carey was an expert in the area of gangs. Although there may be people who are more qualified than Carey in this area, he did testify regarding his training and education and this testimony provided a sufficient basis for the trial court's ruling. Hieu has not demonstrated why the standards regarding scientific experts under *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), and *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981), apply to the case at bar. The State is correct when it asserts that the argument regarding the definition of the term gang deals with the substance of the testimony. As such, the concerns Hieu had regarding Carey's criteria for labeling individuals as gang members should have been brought out in cross-

examination. The arguments regarding Carey's credentials and his conception of what constitutes a gang go to the weight of the testimony, not its admissibility.

## Other Jurisdictions

Other jurisdictions have reviewed a police officer's expertise to testify regarding gangs and have determined that the testimony was properly admitted. *People v. McDaniels,* 107 Cal. App. 3d 898, 904, 166 Cal. Rptr. 12 (1980); *People v. Anderson,* 153 Ill. App. 3d 542, 505 N.E.2d 1303, *cert. denied* 116 Ill. 2d 562 (1987). However, expert testimony regarding the "pattern of criminal gang activity" when based upon nonspecific hearsay rather than personal knowledge has been held inadmissible. *In re Nathaniel C.,* 228 Cal. App. 3d 990, 1003, 279 Cal. Rptr. 236 (1991)

## Right of Association

The First and Fourteenth Amendment association right argument advanced by Hieu is not persuasive. Association rights are not viewed in a vacuum. *Scales v. United States,* 367 U.S. 203, 6 L. Ed. 2d 782, 81 S. Ct. 1469, *reh. denied* 366 U.S. 978 (1961) (association and advocacy may be of the type that is not constitutionally protected—*i.e.,* advocating the overthrow of the government). Hieu's reliance on *Brandenburg v. Ohio,* 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969), is misplaced. *Brandenburg* is a free speech case. Criminal associations are not protected.

Hieu relies on *Dawson v. Delaware,* 503 U.S. ____, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992), as support for his argument opposing the admission of gang evidence. *Dawson* held that stipulated evidence at a sentencing hearing regarding a convicted criminal's white racist prison gang association violated Dawson's rights under the First and Fourteenth Amendments. However, *Dawson* involved a sentencing proceeding. The evidence of gang association was not relevant to that proceeding. 503 U.S. at ____, 117 L. Ed. 2d at 317. *Dawson* does not stand for the position that such evidence must always be excluded. In fact, *United States v. Abel,* 469 U.S. 45, 83 L. Ed. 2d 450, 105 S. Ct. 465 (1984), held that evidence of gang membership was probative of witness bias, and its probative value outweighed the potential for prejudice. *Dawson* does not overrule or limit *Abel*; we read *Dawson*

as applying to the sentencing fact scenario. We rejected Hieu's *Dawson* contention in *State v. Walker,* 252 Kan. 117, 843 P.2d 203 (1992). Trial court discretion in resolving the balance of probative value and prejudice potential is referenced in K.S.A. 60-445.

## Character Evidence

Hieu argues that the evidence regarding gangs was not relevant and constituted improper evidence of his character under K.S.A. 60-447(b). Hieu emphasizes that he did not testify and did not introduce evidence regarding his good character. The State replies that K.S.A. 60-447(b) refers to evidence of a person's character, not to group or gang characteristics. Consequently, the statute cannot be applied to preclude the admission of relevant evidence regarding Hieu's gang affiliation. We agree.

## Res Gestae

We recently approved the admission of gang evidence on a res gestae basis in *Walker,* 252 Kan. 117 and *State v. Hooks,* 251 Kan. 755, 765, 840 P.2d 483 (1992) (gang evidence admitted as a part of the res gestae or of Hooks' responses to questions asked him by the interviewing officers).

Several facts which support the admission of gang testimony as res gestae in the case at bar are emphasized by the State: (1) Ngoc Tran (Toan Q.'s girlfriend) testified that prior to the fight in the parking lot, she heard someone say to Toan Q. " '[D]o you wanna fight one of me or do you wanna fight gang?' " (2) Several witnesses testified that Kevin, the individual who admitted starting the fight in the parking lot, was either a member of the Local Boys or associated with members of the Local Boys. (3) Kevin made the following statement to Toan Q., "[W]hy'd you mess with my brother? You mess with him you mess with me." (4) Witnesses also testified that Jimmy, the individual who started the fight inside the skating rink, was a member of the Local Boys. (5) Charlie Pham testified that he saw Hieu shoot Toan in the back of the head. (6) Keosavan Vilaythong and Panida 'Bybe' Vilaythong testified that Hieu was a member of the Local Boys. (7) The Tran brothers did not belong to the Local Boys. Evidence of gang membership was relevant and constituted proper res gestae evidence.

## Motive

The State argues that evidence of gang membership was relevant to establish Hieu's motive for the crime. Following the fight inside the skating rink, Corby Turner heard a group of three to five Vietnamese males talking about the incident. Turner heard the people in the group say "they were gonna get even and they knew how they were gonna do it." According to the State, Turner's conversation established a link between the fight in the skating rink and the fight in the parking lot that lead to Toan's death. The motivation or desire to "get even" with the Trans, who were involved in the arrest of Jimmy Nguyen, a member of the Local Boys, led to the confrontation in the parking lot. Hieu was a participant in the fight in the parking lot. Hieu made sure the gang retaliated with the Trans when he shot Toan in the back of the head.

Officer Carey testified that if someone got a member of the gang in trouble, the gang would retaliate. Absent evidence of gang affiliation, the jury would wonder why Hieu felt the need to get even with the Tran brothers. Again, evidence of gang affiliation established an alliance among Jimmy, who started the initial fight inside the skating rink; Kevin, who started the fight in the parking lot; and Hieu, who fired the shot that killed Toan. Without evidence of gang affiliation, the State's attempt to establish a motive for the crime would have been impeded.

The trial court did not abuse its discretion when it allowed the State to present relevant evidence of gang membership to establish Hieu's motivation for the crime. Relevant evidence is evidence "having any tendency in reason to prove any material fact." K.S.A. 60-401(b).

The motive concept is similar to the concept adopted by the United States Supreme Court in *Abel* that gang evidence may be admitted to prove bias. 469 U.S. at 49. The admission of evidence to prove motive is also consistent with one of the conclusions within the University of Chicago study cited by Hieu. The study notes: "The definition of a gang incident should be restrictive based on gang function, motivation or particular circumstances, not gang membership alone. A gang incident therefore should be any illegal act which arises out of gang motivation or gang-related circumstances." Spergel, Youth Gangs at 292.

We note that the State requested a limiting instruction on gang evidence. Hieu objected.

The trial court observed:

"You understand you're gonna get—whether there's an instruction or not, you're going to get argument on behalf of the State that your client is a member of a gang and that it is for—"

Hieu's counsel responded:

"I understand I can get argument from the State. And that is just that, it's argument. The jury gets to weigh the evidence. But I think when the court puts any matter with regard to gang in the instructions and let's it go back to the jury, I really have a tough time with the prejudicial value."

The trial court denied the State's request, reasoning:

"I'll find as a matter of law that this is an instruction to which the defendant is entitled, it's not a matter of constitutional magnitude and that it's comparable to the request for an instruction on defendant not testifying. It's controlled by the defendant, not by the State. And since [defense counsel] is opposed to it, I will not give the proposed instruction or any version of it. And I'm not giving it only because [defense counsel's] opposed to it."

For an example of a gang evidence limiting instruction, see *People v. Contreras*, 144 Cal. App. 3d 749, 755 n.2, 192 Cal Rptr. 810 (1983).

## The Lesser Included Offense of Involuntary Manslaughter

Hieu claims that he was entitled to a jury instruction on involuntary manslaughter. He believes that his statement to detectives, that the gun accidentally discharged after his arm was bumped by someone in the crowd, provides the evidentiary support for the instruction. Hieu correctly observes that the State, not Hieu, requested the instruction.

K.S.A. 21-3107(3) sets forth the statutory rule regarding instructions for lesser crimes. A trial court has the duty to instruct the jury on all lesser included offenses established by the evidence. An instruction on a lesser included offense is not required, however, if the evidence at trial excludes a theory of guilt on the lesser offense. *State v. Deggs*, 251 Kan. 342, 344, 834 P.2d 376 (1992).

Involuntary manslaughter is a lesser included offense of second-degree murder. See *State v. Wilburn*, 249 Kan. 678, 687, 822

P.2d 609 (1991). K.S.A. 21-3404(a) describes the elements of the crime:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner."

Hieu contends that he committed an unlawful killing while engaged in an unlawful act not amounting to a felony. At trial, the State argued that Hieu's taped statement established that he committed the murder during the course of either an aggravated assault or attempted aggravated assault, both of which are felonies. K.S.A. 21-3410(c), K.S.A. 1992 Supp. 21-3301(c)(4). (Hieu stated he pointed the gun to scare the person on the ground fighting.) On appeal, Hieu's argument is that the murder was committed while he was engaged in the violation of a Wichita city ordinance that prohibits drawing a firearm upon another.

The State observes that Hieu's argument was never presented to the trial court; consequently, Hieu could not have been found guilty of an unlawful act not amounting to a felony by violating the ordinance. There was no evidence that Hieu was committing an unlawful act not amounting to a felony when he killed Toan. (Hieu neither referenced the alleged violation of the city ordinance nor requested the trial court to take judicial notice of the ordinance under K.S.A. 60-409.) The State asserts that *State v. Cates*, 223 Kan. 724, 576 P.2d 657 (1978), controls. We agree. Cates, who was convicted of second-degree murder, asserted that a homemade gun he was carrying inside a paper sack accidentally discharged while he was in a struggle with his victim. 223 Kan. at 726. Counsel on appeal in *Cates* attempted to justify an involuntary manslaughter instruction based upon a Wichita city ordinance which makes the discharge of a firearm in the city a misdemeanor. We commented that at no time in the trial of Cates was such a theory presented to the trial court. The ordinance was neither in the record or the briefs nor called to the attention of the trial court. No request was made to take judicial notice of it. 223 Kan. at 728. A similar analysis applies to the case at bar. Hieu's claim that the charges in the two cases are dissimilar does not address the failure of Hieu to present the

ordinance at trial. The trial court did not abuse its discretion by refusing to instruct on involuntary manslaughter.

## Certification for Prosecution as an Adult

Any time a court in Kansas is asked to determine whether the prosecution of a juvenile as an adult is warranted it must consider the statutory factors that appear in K.S.A. 1992 Supp. 38-1636(e). Additionally, K.S.A. 1992 Supp. 38-1636(f)(2) requires the court to find, among other things, that there "is substantial evidence that the respondent should be prosecuted as an adult for the offense with which the respondent is charged." The juvenile court judge discussed and made findings on each of the eight K.S.A. 1992 Supp. 38-1636(e) factors. The certification decision is a methodically detailed statement outlining the evidence and reasoning supporting certification. The standard for evaluating whether the decision to certify a juvenile as an adult was proper is whether the decision was supported by substantial evidence. *In re Johnson*, 5 Kan. App. 2d 420, 425, 617 P.2d 1273, *rev. denied* 229 Kan. 670 (1980). The evidence, discussed by the judge when he considered the statutory factors, was sufficient for a reasonable person to conclude that Hieu should have been tried as an adult. Hieu was 17 years old when he went to trial. We find no abuse of discretion in the trial court's authorization to try Hieu as an adult. See *State v. Hooks*, 251 Kan. 755, 840 P.2d 483 (1992).

## The Sentence Imposed

The trial judge in sentencing Hieu considered the K.S.A. 21-4606 statutory criteria which are to be used in fixing minimum prison terms. Hieu asserts that the evidence regarding gang membership prejudiced the trial judge, who imposed the maximum sentence of 15 years to life. The trial judge also found that the acts were premeditated and deliberate. Hieu claims the prejudice is demonstrated by the trial judge's comments that Hieu's "character and attitudes indicate that he is likely to commit another crime," and that "imprisonment would not entail any hardship to anyone." Hieu speculates that the likely source of the judge's opinions in this regard was evidence that Hieu was a member of a gang. Hieu also takes issue with the trial judge's statement immediately after sentencing that the action was premeditated.

The State counters by observing that the trial court stated: "I'm also given the right and duty to look at the seven factors contained in our statute, . . . and those factors when applied to your client require that your client receive the maximum sentence."

Hieu does not claim abuse of discretion. Rather, he asserts the sentence was the result of improper prejudice based upon comments by the judge. Comments by a judge do not necessarily prove that the sentence imposed was improper. *State v. Griffen,* 241 Kan. 68, 72-73, 734 P.2d 1089 (1987). The comments made by the trial judge, in the case at bar, do not rise to the level of partiality or prejudice. Hieu has not provided compelling proof that the judge based his sentence upon improper prejudice instead of the statutory factors. Hieu's argument is based upon his own assertions regarding the motivations behind the judge's actions. The trial judge followed K.S.A. 21-4606 and explained, when challenged, that the sentence was based upon the statute. The trial judge did not abuse his discretion or impose the sentence based upon improper considerations or motives.

Affirmed.

DAVIS, J., not participating.