No. 92,662

STATE OF KANSAS, *Appellee*, v. GILBERT GOODSON, *Appellant*.

(135 P.3d 1116)

Opinion filed June 9, 2006.

*Matthew J. Edge*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*John G. Sauer*, county attorney, *Douglas W. McNett*, of Larned, and *Phill Kline*, attorney general, were on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Gilbert Goodson appeals his convictions and sentences for first-degree murder, aggravated robbery, robbery, and conspiracy to commit robbery. Goodson raises three issues on appeal, arguing the trial court erred in (1) denying his motion to

suppress his confession; (2) allowing evidence of gang affiliation to be introduced; and (3) enhancing his sentence based upon criminal history without requiring the history be included in the complaint and proved to the jury beyond a reasonable doubt.

We affirm his convictions and sentences.

## FACTS

On the night of November 9, 2002, Gregorio Cortez and Davonna Kimble were walking down a street in Dodge City when they were attacked and robbed by Gilbert Goodson and Charles Thomas. During the robbery, Cortez was stabbed to death.

Thomas, who had pleaded guilty to second-degree murder and two counts of robbery for his role in the crime, testified that on the day of the murder, he and two friends, Francisco Gonzales and David Ochoa, went to their friend Regal's house. Because Regal was not at home, the young men waited on the enclosed front porch. Several other people soon arrived, including Goodson. Goodson and Thomas were talking to each other about how tired they were of not having any money. During that conversation, Goodson saw Cortez and Kimble walking down the street and signaled to Thomas to follow him. Thomas understood they were "checking the guy out" and, if they did not know him, they would be taking his money. When Thomas and Goodson caught up to Cortez and Kimble, Thomas pushed Cortez down, causing Kimble to stumble and fall to the ground. Thomas and Goodson searched Cortez for money; Thomas took a couple of dollars and a pack of cigarettes from Cortez. Thomas then told Kimble to give him all her money and jewelry. While Thomas was taking Kimble's property, he could see Goodson punching Cortez. Thomas and Goodson then returned to Regal's house. Upon their return, according to Gonzalez' testimony, Thomas reported that they had gone to "jack somebody" and taken a few dollars and some jewelry.

Kimble, whose preliminary hearing testimony was presented at trial because she was unavailable, testified she recognized the voice of the man who asked her to hand over her money and jewelry as that of "Cita," which is Thomas' nickname. After the attackers fled, she saw "blood everywhere," realized Cortez was hurt, and ran to

a nearby bar where she asked the bar's security guards to call the police. By the time paramedics arrived on the scene, Cortez was dead. An autopsy later revealed that Cortez had died of multiple stab wounds, some of which had penetrated his internal organs.

The State's most convincing evidence was Goodson's confession to police. Goodson was arrested on November 25, 2002, on a probation violation warrant. He was taken to the Dodge City Police Department where Detective Steve Norman interviewed him about the stabbing death of Cortez. Goodson eventually waived his rights and made several videotaped statements where he confessed that he had stabbed Cortez during a robbery. Goodson filed a pretrial motion to suppress these statements, which the trial court denied.

At trial, Detective Norman testified that when he interviewed Goodson on November 25, 2002, Goodson admitted that he and Thomas had robbed the victims and that he had stabbed Cortez. Goodson explained that when he saw Cortez resisting and trying to defend himself, he thought Cortez might be able to get away. His "survival instincts" kicked in, and he stabbed Cortez. Goodson also described to Detective Norman how he had disposed of the knife and the gloves he had been wearing. At the end of the interview, Goodson wrote a letter apologizing to Cortez' mother. That letter was introduced into evidence and read to the jury.

Detective Norman interviewed Goodson again the next day. The detective testified that, during that second interview, Goodson physically demonstrated how he had stabbed Cortez. His description of the incident was consistent with his statement the previous day.

All of Goodson's statements were videotaped. A portion of the videotape of Goodson's first statement on November 25, 2002, was played for the jury, and the jury was also provided a transcript of that portion of Goodson's statement.

Goodson took the stand. He testified that, on the night in question, it was Thomas who prompted him to leave the porch, saying he wanted to talk to the two people walking down the street. When they caught up, Thomas pushed Cortez down and both Cortez and Kimble fell. Goodson testified that, although he had not initially

realized that Thomas intended to commit a robbery, when he saw Thomas and Cortez fighting he asked Kimble to give him what she had. Goodson stated he did not participate in robbing or beating Cortez, only in robbing Kimble.

As to his confession to Detective Norman, Goodson testified that he was "[j]ust trying to cover up for my homeboy, my friend." He thought he could help Thomas by taking the blame so that Thomas could bond out of jail and get away. Then, when the facts came out, the police would eventually have to let Goodson go as well.

The defense also recalled Detective Norman to the stand and played a tape of an interview between the detective and Janie Hernandez. Apparently, Hernandez claimed she knew who was involved in the murder and robbery. The tape of the Hernandez interview is not included in the record on appeal. From defense counsel's closing argument, it appears that Hernandez said she had seen Kimble and Thomas talking at a bar earlier in the evening and that she saw Thomas stab Cortez. Defense counsel argued that Hernandez' version of events was more credible than Kimble's and supported Goodson's story.

The jury convicted Goodson of first-degree murder on both the theory of premeditated murder and the theory of felony murder. The jury also convicted Goodson of conspiracy to commit robbery, aggravated robbery, and robbery. The trial court sentenced Goodson to life in prison for the murder conviction and a consecutive sentence of 233 months for the aggravated robbery with the sentences on the remaining counts running concurrently. Goodson timely appeals his convictions and sentences. This court's jurisdiction is pursuant to K.S.A. 22-3601(b)(1) (off-grid crime).

## SUPPRESSION OF STATEMENTS

Goodson filed a pretrial motion to suppress his statements to police on the grounds that: (1) Detective Norman impermissibly continued to question him after he had invoked his right to counsel and his right to remain silent and (2) the statements were not voluntary because he had ingested a large quantity of methamphetamine and had been without sleep for several days prior to his arrest.

On appeal, Goodson has abandoned the first argument. See *State v. Holmes*, 278 Kan. 603, 622, 102 P.3d 406 (2004) (issue not briefed is deemed waived or abandoned). Regarding the second issue, Goodson argues the trial court erred in denying his motion to suppress which was based upon his assertion that his confession was not voluntarily made. The ultimate issue of voluntariness of a confession is a legal question requiring independent appellate determination. See *Arizona v. Fulminante*, 499 U.S. 279, 287, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991). In reviewing a trial court decision regarding the suppression of evidence, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal decision drawn from those facts by a de novo standard. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006). In making the factual review, the appellate courts will not reweigh the evidence and will give deference to the factual findings of the trial court. 278 Kan. at 612.

Several factors weigh upon the determination that a confession is voluntary, including the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. *Bell*, 280 Kan. at 362-63. Goodson's argument does not focus on these factors, and nothing in the record suggests that any particular circumstance relating to these factors weighs against a determination of voluntariness. Ultimately, a court must examine the totality of the circumstances of the confession and waiver of rights; this examination may extend beyond the listed factors. The essential inquiry is whether, under all of the circumstances, the statement was the product of the free and independent will of the accused. *Bell*, 280 Kan. 362-63.

In this case, the totality of the circumstances was made known to the trial court at the hearing on Goodson's pretrial motion to suppress. At the hearing, Detective Norman testified regarding his observations of Goodson. Goodson testified at the hearing that, at the time of the interview with Detective Norman, he was "coming down" from using methamphetamine continuously for several days and that he did not remember signing the waiver. Additionally, the

trial court agreed to review the videotapes of Goodson's statements and inform the parties of its ruling the next day.

The substance of that ruling is not included in the record on appeal. We only know that the trial court denied Goodson's motion to suppress. Additionally, Goodson has not included the videotapes, the redacted tape shown to the jury, or a transcript of the videos in the record on appeal. Goodson, as the party asserting error, has the burden to designate a record which affirmatively shows prejudicial error in the trial court, and, without such a record, this court presumes the trial court's action was proper. See *Holmes*, 278 Kan. at 612.

In the record which has been provided, there is substantial competent evidence that the statement was voluntary. This conclusion is guided by the decision in *Holmes*. Holmes, like Goodson, argued that drug use and sleep deprivation, among other factors, impaired his ability to give a knowing and voluntary confession. This court noted that "the detectives testified that Holmes appeared coherent, answered questions rationally, and recalled events leading up to the shooting. In addition, he was cooperative with the detectives and showed no signs of being under the influence of drugs except for appearing tired." 278 Kan. at 614. Thus, substantial evidence supported the trial court's finding that Holmes' confession was not involuntary based on drug use. 278 Kan. at 614. With regard to the alleged lack of sleep, the court noted: "Without evidence that Holmes asked to sleep or that he was not allowed to sleep, we cannot conclude that sleep deprivation rendered his statement involuntary." 278 Kan. at 615.

In this case, the interviewing detective, Detective Norman, testified that he had been in contact with people in all stages of methamphetamine use and that Goodson displayed none of the behaviors common to methamphetamine users. The detective testified that he had no problem communicating with Goodson who was "very articulate" and capable of carrying on a "very intelligent conversation" and that Goodson did not appear to be under the influence of alcohol or drugs, under stress, ill, sweating, or shaking. Furthermore, there is no indication that Goodson asked to sleep or was not allowed to sleep.

Thus, there is substantial evidence to support the trial court's factual findings regarding the voluntariness of Goodson's statements. These substantiated findings permit us to independently conclude that, under the totality of the circumstances, Goodson's confessions were voluntarily and knowingly given. As a result, we hold that the statements were voluntary and the trial court did not err in denying Goodson's motion to suppress.

## EVIDENCE OF GANG AFFILIATION

Goodson filed a pretrial motion in limine seeking to prevent the prosecution from introducing any evidence concerning his alleged gang membership. He argued there was no evidence that the crimes were gang related, that gang evidence would prejudice the jury and deny him a fair trial, and that the use of gang evidence was prohibited by K.S.A. 60-455. The State argued that the gang evidence was relevant to show the relationship between the parties and was part of the res gestae "because the reason this happened is because the Defendants knew each other from being in the same gang." The trial court ruled that K.S.A. 60-455 did not apply and that evidence of gang affiliation would be admissible for the purpose of establishing the relationship between Goodson and a witness. However, the court indicated that if the gang evidence was offered for any other purpose, it would consider excluding the evidence.

At trial, the prosecutor questioned Gonzales and Thomas about their gang membership and about the gang affiliations of some of the others who were at Regal's house on the night of the murder. In each instance, Goodson contemporaneously objected but was overruled. Thus, the issue has been preserved for appeal. See K.S.A. 60-404; *State v. Sims*, 265 Kan. 166, 175-76, 960 P.2d 1271 (1998) (admission of gang evidence not preserved where no objection made at trial).

Gonzales testified he belonged to a street gang, "Los Canelas Chingones," (L.C.C.), but he did not know whether Goodson was a member, only that Goodson hung around with them. The prosecutor also asked whether Ochoa or Eric Deleon, who had been

identified as being on the porch, were members, and Gonzales said no.

Thomas testified he had been a gang member since the age of 13. He described the L.C.C. as "a group of people that hung out together since they was little kids" and were friends. When asked what kind of activities L.C.C. members participated in, Thomas said they played basketball and football. The prosecutor then asked if the members ever did things that were against the law, and Thomas responded, "Sometimes."

When the prosecutor asked how Thomas knew Goodson, Thomas answered, "Through the Deleons." The prosecutor asked, "That would be Eric and who else?" Thomas answered, "Augrelio." The prosecutor then asked whether Augrelio was in the L.C.C. and Thomas answered, "Yes." At this point defense counsel not only objected, he requested a mistrial on the grounds that Augrelio Deleon had nothing to do with the case and that the prosecutor was merely introducing his name in order to continue pushing the idea of a gang connection. The trial court denied the motion for a mistrial.

When considering an issue relating to the admission of evidence, an appellate court follows a two-step analytical process of (1) determining whether the evidence was erroneously admitted and (2) determining whether the error calls for reversal of the conviction. *State v. Kesselring,* 279 Kan. 671, 690, 112 P.3d 175 (2005). Regarding the first step, the State points out that a broad abuse of discretion standard has been cited as the appropriate standard of review for determining if there was error in the admission of gang evidence. *State v. Lowe,* 276 Kan. 957, 961, 80 P.3d 1156 (2003). However, to state that in all circumstances the issue of admissibility of gang evidence is reviewed under an abuse of discretion standard is to paint with too broad a brush. "[E]videntiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *State v. Patton,* 280 Kan. 146, 156, 120 P.3d 760 (2005). We, therefore, must examine the specifics of the basis for admission and the objection to determine the appropriate standard of review.

Goodson objected to the gang evidence based upon relevance. A determination of relevance is the first step in analyzing if evidence is admissible. Unless otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. *State v. Marsh*, 278 Kan. 520, 530, 102 P.3d 445 (2004), *cert. granted on other grounds*, 544 U.S. 1060 (2005); see K.S.A. 60-407(f). Because relevancy is a matter of logic and experience, the determination of relevancy is generally seen as inherently discretionary. *State v. Baker*, 219 Kan. 854, 858, 549 P.2d 911 (1976). However, a trial court's discretion must be guided by the considerations imposed by prior case law and the rules of evidence. See *State v. Boyd*, 281 Kan. 70, 79-80, 127 P.3d 998 (2006). Specifically as to gang evidence, this court has imposed some constraints regarding the determination of when the evidence may be relevant. *E.g., State v. Cox*, 258 Kan. 557, 908 P.2d 603 (1995).

Before discussing the specifics of these cases, some general principles deserve discussion. K.S.A. 60-401(b) defines the term "relevant evidence" to mean "evidence having any tendency *in reason* to prove any *material* fact." (Emphasis added.) In *State v. Faulkner*, 220 Kan. 153, 156, 551 P.2d 1247 (1976), the court explained: "Materiality requires that the fact proved be significant under the substantive law of the case and properly at issue." The *Faulkner* court noted that while a " 'an evidential fact [may] be relevant under the rules of logic, it is not material unless it has a legitimate and effective bearing on the decision of the ultimate facts in issue.' [Citation omitted.]" *Faulkner*, 220 Kan. at 156.

Applying these principles, this court has stated that gang evidence may be material and, therefore, relevant when the evidence provides a motive for an otherwise inexplicable act, forms a part of the events surrounding the commission of the crime, or shows witness bias. See *State v. Leitner*, 272 Kan. 398, 414, 34 P.3d 42 (2001) (evidence of gang affiliation indicating a defendant is a member of a gang or is involved in gang related activity is admissible to show a motive for an otherwise inexplicable act or to show witness bias); *State v. Jamison*, 269 Kan. 564, 568, 7 P.3d 1204 (2000) (evidence of gang affiliation relevant to establish motive for shooting); *State v. Roberts*, 261 Kan. 320, 324-25, 931 P.2d 683 (1997) (testimony

regarding gang membership of defendant and defense witness admissible to prove bias and question credibility); *State v. Tran*, 252 Kan. 494, 504, 847 P.2d 680 (1993) (evidence of gang membership relevant and proper as part of evidence of what occurred).

Goodson contends the gang evidence in this case did not fit into any of these categories. We agree. The trial court admitted the gang evidence on the basis that it was relevant to establish the relationship between Goodson and other witnesses, including codefendant Thomas. The precedent of allowing evidence of gang membership to show a relationship between or among witnesses traces back to *United States v. Abel*, 469 U.S. 45, 83 L. Ed. 2d 450, 105 S. Ct. 465 (1984), where the Court held the relationship may be relevant to show bias. See, *e.g., State v. Ross*, 280 Kan. 878, Syl. ¶ 3, 127 P.3d 249 (2006); *State v. Knighten*, 260 Kan. 47, 54, 917 P.2d 1324 (1996); *Tran*, 252 Kan. at 503. In *Abel*, two accomplices to bank robbery pleaded guilty. One, Kurt Ehle, testified against Abel. The defense called an uninvolved person, Robert Mills, as a witness. Mills testified that prior to the trial Ehle had told Mills he intended to falsely inculpate Abel in exchange for leniency. In rebuttal, the trial court allowed the Government to impeach Mills through testimony that Abel, Mills, and Ehle were members of the Aryan Brotherhood, a prison gang, the members of which would perjure themselves for one another. The Court stated: "[T]he *type* of organization in which a witness and a party share membership may be relevant to show bias. . . . The attributes of the Aryan Brotherhood—a secret prison sect sworn to perjury and self-protection—bore directly not only on the *fact* of bias but also on the *source* and *strength* of Mill's bias." 469 U.S. at 56.

However, this case does not fit the *Abel* stencil. The other gang members were not testifying to protect Goodson, they were implicating him. The State did not seek to impeach its own witnesses by showing their potential bias; the questions asked of Gonzales and Thomas were not framed in a manner to reveal bias or loyalty.

Additionally, the relationship of various witnesses may be relevant if the gang evidence was part of the criminal events. In this case, there was no evidence that it was. This was not a situation where, for example, someone asked the victim whether he wanted

to fight only one person or the whole gang (*State v. Tran*, 252 Kan. at 504), or the perpetrators made statements about their gang membership in the presence of the victims (*State v. Hooks*, 251 Kan. 755, 765, 840 P.2d 483 [1992]). In essence, the State failed to show how the references to a gang had any tendency to prove a material fact.

Furthermore, prior decisions have found error in the admission of gang evidence when a proper foundation has not been laid. *E.g., State v. Cox*, 258 Kan. 557, 908 P.2d 603 (1995). Such cases illustrate, even if they do not articulate, the principle that the court's discretion is limited by statutory and common law requirements. In *Cox*, the court held that evidence suggesting there was a conspiracy between young people to commit a crime did not make expert testimony regarding gangs relevant where there was no evidence suggesting either gang involvement or gang motivation. 258 Kan. at 565. Additionally, this court has held that evidence of gang affiliation is admissible to show motive for an otherwise inexplicable act only where there is sufficient proof that gang membership or activity is related to the crime charged. *E.g., State v. Gholston*, 272 Kan. 601, Syl. ¶ 4, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002). Although this court has not held that proof of gang affiliation is part of the foundation when evidence is used to prove bias, we agree with other courts which have reached this conclusion. See *United States v. Keys*, 899 F.2d 983, 987 (10th Cir. 1990) ("Absent such a foundation, . . . statements concerning gang membership are not probative of bias on the part of [the witnesses] due to common membership in a gang."). In this case, the State never established that Goodson was a gang member and, therefore, did not lay the foundation necessary to show that there was a gang relationship between Goodson and the witnesses.

In reaching the conclusion that the evidence was not admissible because of lack of foundation, we are cognizant of the fact that the prosecutor stated an intention to lay the foundation. We understand that the trial court is in a different position, waiting for the State to build the wall of the case, including any necessary foundations, brick by brick. We, on the other hand, have the benefit of hindsight and a transcript. However, we also note that when Gon-

zalez did not establish that Goodson was a member of the L.L.C. or that Regal's house was a gang hangout, defense counsel renewed the objection to the evidence in a fairly lengthy hearing outside the jury's presence. No proffer was made, and the foundation problem was not cured with subsequent evidence.

Moreover, the questioning went far beyond showing a relationship between Goodson and witnesses; the prosecutor asked about other gang members who were not present, were not witnesses, and who had nothing to do with the crime. In fact, it was after one of these questions that defense counsel asked for a mistrial. The fact that Goodson associated with members of a gang who were not present at the crime and had no relationship to the criminal activity is not relevant to any material issue of fact. *Perez v. State,* 830 S.W.2d 684, 687-88 (Tex. App. 1992).

Finally, Goodson argues the evidence should have been excluded under K.S.A. 60-455 which provides that evidence of prior crimes or civil wrongs cannot be admitted to prove a propensity to commit the crime, but can be "admissible when relevant to prove some other material fact." K.S.A. 60-455. We have repeatedly held that evidence of membership in a gang is not a crime or civil wrong and, therefore, gang membership alone is not subject to the rule of exclusion under K.S.A. 60-455. *E.g., Ross,* 280 Kan. at 886; *Lowe,* 276 Kan. at 963. In this case, however, the State went beyond asking about membership in gangs and asked Gonzales whether the L.L.C. committed illegal acts. This question was not relevant to prove any material fact except propensity or bad character; no attempt was made to tie the evidence to any basis for admission permitted by K.S.A. 60-455. The admission of the evidence was a flagrant violation of the prohibition on the introduction of prior crimes evidence codified at K.S.A. 60-455.

We, therefore, conclude it was error to admit the gang evidence in this case.

We must now determine whether the admission of this evidence requires reversal. Goodson contends that, because the erroneous admission of gang evidence implicated his constitutional right to a fair trial, the constitutional harmless error analysis should apply. Under that analysis, where the erroneous admission of evidence

violates a defendant's constitutional rights, an appellate court may not hold the error to be harmless unless the court is willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967).

The State argues for application of the harmless error rule of K.S.A. 60-261, which states that a trial court's error in the admission of evidence is not grounds for reversal unless the failure to do so would be inconsistent with substantial justice. The statute also instructs the court to disregard any error "which does not affect the substantial rights of the parties." K.S.A. 60-261; *Kesselring*, 279 Kan. at 690.

Our cases have applied both standards when considering the admission of gang evidence. In *State v. Robinson*, 261 Kan. 865, 893, 934 P.2d 38 (1997), the standard was stated as whether it was "clear beyond a reasonable doubt that the improper gang comments had little, if any, likelihood of changing the result of the trial." The reference to gangs came in the prosecutor's closing argument. 261 Kan. at 892. We have recognized prosecutorial misconduct as an area implicating the defendant's constitutional right to a fair trial. *E.g., State v. Kleypas*, 272 Kan. 894, 1084, 40 P.3d 139 (2001). See *State v. Tosh*, 278 Kan. 83, 96-97, 91 P.3d 1204 (2004) (recognizing dual test under *Chapman* and K.S.A. 60-261 should apply to prosecutorial misconduct). In this case, there was no reference to gangs during the closing argument and the issue has not been presented as one of prosecutorial misconduct. *Robinson* is, thus, not clear precedent for applying the constitutional harmless error standard.

The *Cox* court also applied the constitutional harmless error standard. In doing so, the court cited to *State v. Davis*, 256 Kan. 1, 16-17, 883 P.2d 735 (1994), which in turn cited *Delaware v. Van Arsdall*, 475 U.S. 673, 682-83, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986). Both *Davis* and *Van Arsdall* applied the constitutional harmless error standard when a defendant was erroneously prohibited from cross-examining a witness regarding potential bias. In *Van Arsdall*, the Court held that the complete prohibition against the cross-examination was a violation of the Confrontation Clause

and, thus, was a constitutional violation requiring application of the *Chapman* constitutional harmless error standard. Goodson's arguments do not raise a confrontation clause issue and, therefore, these authorities are not directly applicable.

*Roberts* on the other hand dealt with the introduction of testimony. In that case this court held: " 'Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done.' " 261 Kan. at 325-26. *Roberts* thus suggests K.S.A. 60-261 is the appropriate test to be applied in this situation. However, there is no indication in *Roberts* that the defendant argued the error in admitting the evidence was so egregious it implicated his due process right to a fair trial. Goodson makes this argument.

Had the question about prior crimes not been asked, the State's argument might be persuasive. But the case law is unsettled regarding whether due process is implicated when there has been an erroneous admission of evidence of prior crimes or of bad character. Most recently, the United States Supreme Court expressly reserved the question of whether admission of propensity evidence violates the Due Process Clause. *Estelle v. McGuire,* 502 U.S. 62, 75 n.5, 116 L. Ed. 2d 385, 112 S. Ct. 475 (1991). Given the unsettled state of the law and because we conclude that either test can be satisfied in this case, we will assume but not determine that due process is implicated and apply the dual standard of the *Chapman* constitutional harmless error test and the harmless error test of K.S.A. 60-261.

Goodson contends that the prosecution's introduction of gang evidence "raised the specter of a hardened band of criminals." While it is true that evidence of gang membership could have led the jury to infer that Goodson, who was in the presence of gang members, had a propensity for committing violent crimes, the State presented independent evidence of a direct and overwhelming nature to establish that Goodson committed the crimes. Two eyewitnesses, Kimble and Thomas, testified that Goodson was responsible for Cortez' injuries. Most importantly, Goodson confessed to police that he stabbed the victim in the course of a robbery. Although he partially recanted that confession at trial, he continued

to admit that he had participated in the robbery, and the State successfully pointed out inconsistencies in his claim that he had confessed in order to help codefendant Thomas.

Furthermore, as previously noted, the prosecutor did not mention any of the gang evidence during closing argument. Nor, for that matter, did the prosecutor mention gang activity during its opening statement. Thus, any potential prejudicial effect of the prosecutor's questions about gang affiliations was not exacerbated by additional emphasis during opening or closing argument. See *Cox*, 258 Kan. at 566 (relying in part on fact that State did not emphasize gang evidence in opening or closing statements to find error harmless).

Defense counsel also made a brief reference to gang evidence during his questioning of Detective Norman and during closing argument. Apparently, during the detective's interview with Janie Hernandez, he showed her a photo lineup of six people. Hernandez identified all six of the people as "cholos," a term the detective understood to mean gang members. Charles Thomas was one of the persons in that lineup. Defense counsel appears to have been trying to bolster Hernandez' credibility by showing that she had accurately identified the persons in the photo lineup as gang members. Thus, Goodson also put gang evidence before the jury, albeit in a limited manner.

Finally, evidence that Thomas and Goodson were affiliated with the same gang may have actually supported Goodson's theory that he gave a false confession in order to help free Thomas.

Under these circumstances, the erroneous admission of gang evidence can be declared harmless beyond a reasonable doubt and the error did not affect Goodson's substantial rights.

## USE OF PRIOR CRIMINAL HISTORY

Finally, Goodson argues that the use of his prior convictions in his criminal history score to enhance his sentence without requiring the history to be included in the complaint and proved to the jury beyond a reasonable doubt violated his Sixth and Fourteenth Amendment rights under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Goodson acknowl-

edges that this court has previously rejected this argument in *State v. Ivory,* 273 Kan. 44, Syl., 41 P.3d 781 (2002) (*Apprendi* does not apply where sentence based on defendant's criminal history score). He raises the issue to preserve it for future federal review.

Goodson cites no new authority which might persuade the court to overrule *Ivory.* Furthermore, this court recently considered and discussed the most recent United States Supreme Court and Tenth Circuit case law on this issue in *State v. Lackey,* 280 Kan. 190, 235-40, 120 P.3d 332 (2005). The *Lackey* court found no reason to alter its previous decision in *Ivory* and concluded that the use of prior convictions to increase a sentence continues to be constitutional.

Affirmed.