NOT DESIGNATED FOR PUBLICATION

No. 113,547

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE INTEREST OF C.W.

MEMORANDUM OPINION

Appeal from Allen District Court; DANIEL D. CREITZ, judge. Opinion filed September 4, 2015. Affirmed.

*Melissa R. Dugan*, of Kluin Law Office, LLC, of Chanute, for appellant natural mother.

*Jerry B. Hathaway,* county attorney, for appellee.

*Charles H. Apt III*, of Apt Law Offices, LLC, of Iola, guardian ad litem.

Before HILL, P.J., PIERRON and POWELL, JJ.

*Per Curiam*: H.W., the natural mother of C.W., appeals from the termination of her parental rights to C.W. Parental rights may be terminated only in circumstances set out by statute and only when clear and convincing evidence supports termination.

On appeal, Mother claims the evidence was insufficient to terminate her parental rights, the district court improperly applied the presumption of unfitness, and it was not in C.W.'s best interests to terminate her rights. But termination is authorized when on two or more prior occasions a child in the parent's custody has been adjudicated a child in need of care (CINC), K.S.A. 2014 Supp. 38-2271(a)(3); when the child has been in an out-of-home placement under court order for a cumulative period of more than a year and the

1

parent has substantially neglected or willfully refused to carry out a reasonable plan towards reintegration, K.S.A. 2014 Supp. 38-2271(a)(5); when a parent has shown conduct towards a child of a physically, emotionally, or sexually cruel or abusive nature, K.S.A. 2014 Supp. 38-2269(b)(2); when a parent has physically, mentally, or emotionally abused or neglected or sexually abused a child, K.S.A. 2014 Supp. 38-2269(b)(4); when reasonable efforts by public and private agencies to get the family back together have failed, K.S.A. 2014 Supp. 38-2269(b)(7); or when a parent has shown a lack of effort to adjust his or her circumstances, conduct, and condition to meet the child's needs, K.S.A. 2014 Supp. 38-2269(b)(8).

At the time the district court terminated Mother's parental rights, C.W. had been in State custody and placed in foster care for nearly 3 years after the court had determined that C.W. was a CINC. The family had received services from social service agencies. Mother was permitted supervised visits with the children. The family had received home inspections. C.W. had an individual therapist. Although Mother had successfully completed many of the tasks assigned to her, she had refused to leave D.W., C.W.'s natural father, despite allegations of sexual abuse against him.

The termination of parental rights is a serious matter. A review of the entire record in this case reveals clear and convincing evidence that Mother was unfit as a parent and that the conditions leading to that finding were unlikely to change in the foreseeable future. Therefore, we affirm the district court's judgment.

Because Mother challenges the sufficiency of the evidence to support termination of her parental rights, and due to the fact-sensitive nature of these cases, facts will be set out in detail. Mother and Father were married and lived with Father's two children from his previous marriage to M.W.—Ch.W. (d/o/b 2001) and R.W. (d/o/b 2005). Father and Mother had three children together: K.W. (d/o/b 2007); B.W. (d/o/b 2008); and C.W.

2

(d/o/b 2010). K.W. and B.W. had been previously adjudicated CINCs in Bourbon County. Mother and Father had relinquished their rights to K.W. and B.W.

In this case, the district court case involved Ch.W., R.W., and C.W. Though Mother generally complied with the court's orders, her rights were terminated for staying with Father. Throughout the course of this case, there were allegations that Father had sexually abused R.W. and possibly Ch.W. Therefore, the underlying facts of Ch.W. and R.W.'s cases are relevant here, as are the court's findings related to Father.

On April 4, 2012, the State filed a petition in Allen County District Court alleging C.W. was a CINC in case No. 12-JC-29. The State also filed petitions alleging Ch.W. was a CINC in case No. 12-JC-27 and R.W. was a CINC in case No. 12-JC-28. Those petitions were not included in the record.

This was the second CINC case involving C.W. In 12-JC-29, the State alleged that C.W. was without adequate parental care, control, or subsistence, and the condition was not due solely to the lack of financial means of the child's parents under K.S.A. 2014 Supp. 38-2202(d)(1); and that C.W. had been residing in the same residence with a sibling or another person under 18 years of age who had been physically, mentally, or emotionally abused or neglected or sexually abused under K.S.A. 2014 Supp. 38-2202(d)(11).

The petition was based on the following facts: C.W. lived with Mother and Father and Father's two other children, Ch.W. and R.W. Social and Rehabilitation Services (SRS), now the Kansas Department for Children and Families (DCF), received a report that Father and Mother had left Ch.W., R.W., and C.W. unattended while Father drove Mother to work. A social worker, Katy Mueller, interviewed Ch.W. and R.W. Both reported that Father had left Ch.W. in charge of R.W. and C.W. while he drove Mother to

3

work. Ch.W. and R.W. reported Father and Mother fought and used foul language in front of them and that Father had held Mother up against the wall.

R.W. also reported physical abuse. Ch.W. and R.W. showed Mueller bruises on their bottoms and the back of their thighs. Iola Police Officers also noticed C.W. had a moderately severe diaper rash and three faded bruises on his left arm. All three children were taken into protective custody. C.W. was taken into custody as a child who was within the residence of siblings who had been physically, mentally, or emotionally abused and neglected.

Mother and Father's relationship had also been violent at times. The CINC petition in 12-JC-29 mentioned two domestic violence cases in which Father and Mother had filed protection from abuse (PFA) petitions against each other in July 2011. As a result of the evidence from domestic violence cases, C.W. was taken into DCF custody pursuant to an Allen County court order in case No. 11-JC-30, the first CINC case involving C.W. On September 13, 2011, C.W. had been adjudicated a CINC in 11-JC-30 but subsequently released to Father and Mother on January 17, 2012. 11-JC-30 was terminated. No documentation from either the domestic violence cases or the CINC case is included with the record.

Mueller had also provided a letter to the Allen County Attorney's Office detailing social services agency involvement with the family. The letter itself is not included in the record, but the State's petition included a summary. Mueller reported 11 encounters with the family between October 17, 2007 and November 29, 2011, including claims of lack of supervision, physical abuse, physical neglect, and medical neglect.

Based on the previous reports, the ages of the children, reports of abuse, the volatility of Father and Mother's relationship, and the bruising observed by law

4

enforcement and DCF officials, DCF recommended Ch.W., R.W., and C.W. be placed in DCF custody.

On April 17, 2012, the district court issued an order of temporary custody for all three children. The court found an emergency existed that threatened the safety of Ch.W., R.W., and C.W. The court removed all three children from the home and placed them in DCF custody. The court took judicial notice of 11-JC-30—the previous CINC case for C.W.

On June 12, 2012, the district court issued its order adjudicating C.W., Ch.W., and R.W. as CINCs. Father and Mother submitted stipulations of statements of no contest. Relevant to this appeal, the court found that C.W. was without adequate parental care, control, or subsistence and the condition was not due to solely the lack of financial means under 2014 Supp. K.S.A. 38-2202(d)(1); was without the care or control necessary for the child's physical, mental, or emotion health under K.S.A. 2014 Supp. 38-2202(d)(2); and had been physically, mentally, or emotionally abused or neglected, or sexually abused under K.S.A. 2014 Supp. 38-2202(d)(3). The court ordered C.W. remain in DCF custody.

The district court held multiple hearings between June 2012 and November 2013. The following orders are relevant to this appeal: On August 7, 2012, the court ordered the parties to "continue to allow submission of results of investigation by DCF into allegations of sexual abuse"; on October 16, 2012, the court found a dual case plan goal of reintegration and adoption for Mother was still viable, but reintegration with Father was not a viable case plan option due to the allegations of sexual abuse, and the children were to remain in DCF custody. The court issued a no contact order between Father and C.W., and visitation with Mother continued to be supervised. The court noted out-of-home placement as to Mother was still necessary because Mother continued to live with Father; and on June 25, 2013, the court ordered visitation at the discretion of the social service providers and pending approval of the children's therapists.

The district court held a review hearing on November 19, 2013. Visitation with Father continued to be suspended. The court ordered R.W.'s therapists to provide full reports regarding visitation with Father at the next court date. The report was not included in the record on appeal. The court held a permanency hearing on February 25, 2014. The transcript of that hearing was included in the record on appeal.

Barry Plumlee testified. He has a master's degree in marriage and family therapy and worked as a mental health clinician for Crawford County Mental Health. He had been working in that capacity for Crawford County for 7 years. R.W.—8 years old at the time—was one of his clients. Plumlee had met with R.W. approximately a dozen times for hour-long therapy sessions. Plumlee worked with R.W. based on the allegations of sexual abuse by Father, lack of care, and stabilizing his behavior within the foster home.

Plumlee testified he had prepared a report on December 4, 2013, in which he recommended R.W. not have contact with Father. This report was not included in the record. On November 21, 2013, R.W. first stated that Father had sexually abused him. Though R.W. was initially reluctant to talk about it, he eventually opened up to Plumlee. R.W. described the first instance of sexual abuse in detail. R.W. was clear that it was Father who had sexually abused him.

Since the initial disclosure, R.W. had not provided any new information but consistently told the same story. R.W. said Father had threatened to hit him with a pole if he told people about the event. R.W. was unable to provide a specific date this event occurred but said it occurred when he lived with Father and M.W. R.W. also indicated he had been abused by Father between 15 and 20 times, but he only provided details of the first instance.

6

Plumlee testified he had no doubt R.W. believed he was sexually abused by Father and Plumlee had no reason to doubt R.W. Based on the foregoing, Plumlee felt Father should not have any contact with R.W. and he could not think of anything that would change his recommendation. Plumlee testified that absent the sexual abuse allegations, he felt the family could be involved in intensive family therapy. However, because R.W. reported sexual abuse, Plumlee "wouldn't ever recommend [family therapy]."

Plumlee testified he had not spoken to either parent about the allegations because the procedure he followed was to report the abuse to the social service agency and "let them handle that."

Rhoda L. Schwindt also testified. Schwindt was a mental health therapist and licensed Master's social worker. She worked for a private practice. C.W. was 2 years old when Schwindt first met with him on October 23, 2012. She had met with C.W. nearly 50 times as of the hearing. At the beginning, C.W. was nonverbal and exhibited a lot of anger and aggression. He was also very compulsive and rarely smiled. Schwindt described him as "hypervigilant." Schwindt testified these characteristics and behaviors were not natural for a child C.W.'s age.

Schwindt testified C.W.'s behavior had improved over time. However, after a visit with Father on September 19, 2013, C.W. regressed. He had not had a prior visit with Father during Schwindt's time as his therapist. C.W. was very distressed and overreactive at the first session with her after the visit with Father. He was clingy with his foster parents, and Schwindt felt "he was needing a safe environment." She described C.W.'s response as mirroring post-traumatic stress disorder (PTSD), which is "caused by an incident or happening or observed by a person that is so traumatic it's ingrained, and a trigger will reinforce that process to come back." Schwindt was concerned about C.W. having contact with Father based on C.W.'s response to the visit. She felt contact with Father would be harmful to C.W. Schwindt testified she had not seen such negative

7

responses to visits with Mother and felt it was not "an impossible feat" to suggest reunification with Mother could be in C.W.'s best interests at some point.

Mother testified she still lived with Father. She testified Father was "innocent" of sexually abusing his children and she had "no reason" to separate from him. She testified she wanted her whole family together. She testified the abuse had occurred but not in her household. She stated she would choose C.W. over Father if she was forced to choose. However, she had yet to leave Father despite the district court finding C.W. could not live with her because she continued to live with Father.

Mother testified that during the September 19, 2013, visit with Father and C.W., C.W. told her, "My daddy touches me." She testified, "Out of nowhere [C.W.] . . . says, My daddy touches me in the night. And I asked him . . . What do you mean? And he's like, Well [my foster mom] told me. And then that's all he said."

Mother testified she and Father first reported the sexual abuse allegations. They thought the perpetrator was a man named Josh who lived with M.W. She testified they reported the incident to the Garnett police station when she was approximately 4 months pregnant with C.W. She testified R.W. referred to M.W.'s boyfriends as "dad." No documentation of the police report allegedly filed in Garnett was included in the record.

Father testified Ch.W. and R.W. had lived with him most of the time after he divorced M.W., but they had lived with M.W. for approximately 1 year. He denied sexually abusing his children. Father suggested it was either M.W.'s boyfriends or Ch.W. who had abused R.W. instead. Father testified he and Mother had walked in on Ch.W. touching R.W. inappropriately. Father also testified there were abuse allegations against M.W. for putting a cigarette out on Ch.W.'s arm. Father said he reported it to Ch.W.'s teacher and indicated he had paperwork somewhere to substantiate the claim. The paperwork substantiating this report or the allegations against M.W. for abuse is not

8

included in the record on appeal, and the record indicates Father never presented it to the district court.

The State contended Father's claim that Ch.W. and R.W. had been abused by M.W. did not mean that Father had not also abused R.W., especially in light of Plumlee's testimony about R.W.'s disclosure. The State argued reintegration with Mother was not a viable option until she left Father. The State recognized it would be better to have something more substantiated than the testimony of therapists, but the evidence "paint[ed] a pretty clear picture that [C.W.] at his age is in a very dangerous position, should the Court . . . find any merit to the testimony of Barry Plumlee." The State argued that continued out-of-home placement was in C.W.'s best interests.

The State stated, "If [Mother] would separate from [Father] . . . she's done what's been asked of her. But the mere fact that she chooses to remain with [Father], in the state's opinion, prohibits her from being an option with [C.W.]. I find that unfortunate. But that's her choice to make." The State asked the district court to establish adoption as the case plan goal based on the information presented at the hearing.

The guardian ad litem (GAL) who represented C.W.'s interests throughout the proceedings agreed with the State's request. The GAL indicated his belief that Mother had "disqualified herself by her continued association with [Father]."

Mother's attorney argued the version of sexual abuse testified to by Plumlee "just doesn't make any sense." Mother's attorney suggested the therapists had not explored other options for identifying the perpetrator and instead focused only on Father. He suggested C.W. would not be harmed if the district court gave 90 days to "work on some sort of enhanced family therapy so that we can determine, one, when the therapists have all of their information whether their recommendations might change; also to see how [C.W.] is going to react to this with his Father being reintegrated." He did not believe

9

"enough of this story rings true to warrant changing the permanency going to one of simply adoption."

The district court found that adequate progress had been made towards the current case plan goals, and reasonable efforts had been made by the service providers, and out-of-home placement continued to be necessary for the safety and well-being of the children. The court made a finding that reintegration was not a viable alternative and ordered the State to prepare a motion for termination of parental rights.

In its written order, the district court found allegations of sexual abuse by Father existed and therefore out of home placement was necessary for C.W. The court adopted a case plan goal of adoption only.

The court held status hearings on April 29, and June 24, 2014.

On August 26, 2014, the State filed a motion to terminate Mother's and Father's parental rights as to C.W. The State alleged Mother and Father were both presumptively unfit and statutorily unfit.

The State alleged Mother was presumed unfit because on two or more prior occasions, a child in Mother's physical custody had been adjudicated a CINC under K.S.A. 2014 Supp. 38-2271(a)(3); and C.W. had been in out-of-home placement under court order for a cumulative period of more than a year and Mother had substantially neglected or willfully refused to carry out a reasonable plan, approved by the court under K.S.A. 2014 Supp. 38-2271(a)(5).

The State included information about the previous cases in which a child in Mother's physical custody had been adjudicated a CINC including the district, the case

10

number, and a summary of the procedural history of the cases. The State made the same allegations against Father.

The State also alleged Mother was statutorily unfit due to conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature under K.S.A. 32014 Supp. 8-2269(b)(2); physical, mental, or emotional abuse or neglect or sexual abuse of a child under K.S.A. 2014 Supp. 38-2269(b)(4); failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family under K.S.A. 2014 Supp. 38-2269(b)(7); lack of effort by Mother to adjust Mother's circumstances, conduct, or conditions to meet C.W.'s needs under K.S.A. 2014 Supp. 38-2269(b)(8); and failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on the ability to pay under K.S.A. 2014 Supp. 38-2269(c)(4).

The State made the same allegations against Father.

The State included in its motion a timeline of the abuse allegations against Father from April 2012 through February 2014 as reported by the foster parents, therapists, and other social services agencies employees. None of the underlying documentation—reports, emails, etc.—was included in the record on appeal.

The State also included sexual abuse history with law enforcement dating back to October 2012. None of the police reports or other documentation is included in the record on appeal. From the State's motion, it appears Deputy Tim Beckham "reviewed forensic interviews" of Ch.W. and R.W. that DCF had completed. DCF had interviewed Ch.W. and R.W. on three separate occasions: twice in May 2012, a third interview of Ch.W. in July 2012, and a third interview of R.W. in August 2012. The outcome of Beckham's review was not mentioned in the State's motion.

The State provided the following factual basis as to the motion to terminate Mother's and Father's parental rights as to C.W. Ch.W. and R.W. were involved in companion CINC cases; C.W. had been out of the home pursuant to court order continuously since April 4, 2012; and Mother and Father continued to live together. The State summarized the various court proceedings and case plan conferences held during the duration of this case.

The State alleged Mother had failed to sufficiently comply with case plan tasks. The State alleged Mother had complied with the following orders: obtain and maintain employment, maintain at least one form of transportation that was legally tagged and insured, have safety plans and discipline policies, remove cigarettes from Ch.W.'s and R.W.'s access, refrain from speaking negatively about M.W. in the presence of Ch.W. and R.W., submit to random urinalysis tests, and provide social services agencies with adoptive resources. Mother had partially complied with the following orders: meet DCF standards of home health and hygiene, successfully complete parenting courses—though Mother did engage in an 8 week parenting class, she allegedly failed to attend a parenting class for the 1-4 year old age group—complete an anger management intake and parenting assessment, and remove all boards from the home and lock tools away.

The State further alleged that Mother and Father's first home had failed two home inspections but had passed the third. Then, when Mother and Father relocated, the new home "needed minor corrections to meet the DCF minimum standards." It was unknown whether Mother completed the recommendations of therapy. She had attended visitations with C.W. on a regular and continuous basis.

The State also summarized the family's history with Kansas social service providers. The list was substantially the same as the list included in the CINC petition. It additionally included the substantiated claim of physical abuse of Ch.W. and R.W. by Father on April 27, 2012.

The State alleged the following prior adjudicated CINC cases: C.W. had been adjudicated a CINC in Allen County case No. 11-JC-30; B.W. had been adjudicated a CINC in Bourbon County case No. 08-JC-51 based on "issues surrounding the medical attention provided to" B.W. and "deplorable living conditions." Father and Mother relinquished their respective parental rights to B.W.; and K.W. had been adjudicated a CINC in Bourbon County case No. 08-JC-51. Father and Mother had relinquished their rights to K.W.

The State referenced the sexual abuse allegations against Father. In support of the abuse allegations, the State claimed the foster parents had made numerous reports. In April 2012, R.W.'s foster mother reported R.W. referenced instances when both Father and Ch.W. would molest R.W. R.W. also indicated Father had "stuck his penis in [R.W.'s] butt" and "pinche[d] his penis as well as [Ch.W.'s] penis very hard and several times in a row when they get in trouble." R.W. reported that Father had hit C.W. in the penis too. DCF had received hotline reports of alleged sexual abuse of R.W. by Father. Ch.W. reported that Father had touched Ch.W. "in his front and back private parts." Ch.W. reported that Father touched R.W. and described the touches as not being "right." Ch.W.'s foster mother "was given the impression that [Ch.W.] was jealous of [R.W.] because of [Father] touching him."

In June 2012, Ch.W. and R.W.'s foster parents reported that R.W. "wanted to have sex with another boy" at an after-school program. R.W. stated he knew what sex was because he watched Father and Mother have sex on the couch in the living room. R.W. said Father and Mother "mess with his butt" when they are finished having sex. R.W. stated he "'just wants to put his penis in [J's] butt."

In August 2012, Ch.W. and R.W.'s foster mother also reported an incident in which she noticed R.W. bent over, pointing to his buttocks. She indicated Ch.W. said,

13

"[N]ot now." When she asked both boys what they were doing, both said Ch.W. put his "weenie" in R.W.'s butt. Both boys indicated Father knew about this. Ch.W. said he also did this to C.W.

Ch.W. was eventually removed from the foster home of R.W. after R.W. reported that Ch.W. threatened to kill or beat R.W. in the head until he was almost dead. R.W. acted out in school and engaged in increasingly sexualized behavior. Father and Mother had indicated their solutions for this behavior were to place Ch.W. in another city and bribe R.W.

The Southeast Kansas Mental Health Center (SEKMH) reported R.W. struggled with bowel movement control. R.W. had also reported sexual abuse by Father to Patrick Cole of SEKMH. The report indicated R.W.'s struggle to maintain bowel movement control could be tied to reports of sexual abuse. On June 23, 2012, R.W. drew pictures depicting sexual abuse by Father.

The State reminded the district court that visitation with Father had been suspended due to these allegations. Ch.W. and R.W. expressed fear of Father.

The State provided multiple reports of the same behavior by Ch.W. and R.W. suggesting both were victims of sexual abuse by Father. Again, none of the actual reports were in the record.

C.W. reportedly struggled with redirection and verbal cues, emphasized by visitation with Father. He regressed after visitation. During one visitation while Mother was changing C.W.'s diaper, C.W. "grabbed his penis and asked [Mother] '. . . Daddy . . . to my wee wee?'" KVC—a social services agency—had reported C.W. exhibited sexual behaviors after a visit with Father.

14

The State argued that reuniting C.W. with Mother or Father was not a viable option. Further, Mother and Father were unable to provide C.W. with a "minimally safe, wholesome, and stable environment." The State asked the district court to deem Mother and Father unfit and requested the court to determine whether it would be in C.W.'s best interests to terminate the rights of Mother and Father and to do so if it made that finding. None of the reports mentioned in the State's petition are included in the record.

The district court held multiple additional review hearings. On February 4, 2015, the court held a hearing on terminating the parental rights of Mother to C.W. and Father to C.W., Ch.W., and R.W. The court took judicial notice of its files from the current cases involving C.W., Ch.W., and R.W. Father's attorney provided the court with a document indicating DCF was unable to substantiate claims of sexual abuse against Father in July 2012. Father's attorney also provided a report from Father's physician indicating Father had been diagnosed with genital warts in 2010.

Relevant to this appeal, the State expressed its belief that the parental rights of Father and Mother should be severed because of the allegations of sexual abuse by Father and Mother's inability to follow through with the plan developed in the case by DCF. The GAL indicated the belief that the evidence supported a finding of unfitness and termination of Father's and Mother's rights.

Michele Hockett is a social worker for KVC, a social services agency. She had not been involved in the case from the beginning, but she had DCF's termination summary outline which detailed social service involvement. This document was not included in the record on appeal. She testified regarding the history of DCF and KVC's involvement with the family. Her testimony was substantially the same as the State's initial CINC petition. The initial referral on April 4, 2012, was for a lack of supervision. Father and Mother had left the children at home alone while Father took Mother to work. The children were removed from the home and had been out of the home continually since then. Ch.W. and

15

R.W. also showed signs of physical abuse. After the first case plan meeting and adjudication hearing on May 1, 2012, the initial case plan goal was the dual goal of adoption or reintegration. Father and Mother were assigned the tasks of maintaining housing and a vehicle and completing parenting classes. Though Father and Mother did not complete the tasks initially, eventually they did.

Hockett testified the case plan goal changed in July 2014 to adoption only due to concerns of the physical and sexual abuse of the children. The court had suspended Father's visitation in August 2012 after C.W. began exhibiting inappropriate sexual behaviors after visitation with Father. Hockett testified there were also allegations of sexual abuse of Ch.W. and R.W. by Father. Hockett acknowledged DCF was unable to substantiate the sexual abuse allegations at one point. However, DCF continued to receive reports against Father of sexual abuse from Ch.W. and R.W.'s therapists identifying Father as the perpetrator.

Hockett testified Mother attended most of her visits and only cancelled a few due to work conflicts. She testified that reintegration of Father and C.W. was no longer a possibility due to the concerns of the sexual abuse of Ch.W. and R.W. by Father. Hockett felt reintegration with Mother was still an option if she would leave Father, maintain housing, and keep Father out of C.W.'s life. However, Hockett testified Mother had been given opportunities to leave Father but had failed to do so. Hockett testified the only thing standing in the way of changing the case plan goal as to Mother was her failure to leave Father.

Hockett testified marriage counseling and anger management had been requested but not family therapy. Hockett testified that generally family therapy would be ordered at the discretion of the children's therapists. In this case, the children's individual therapists had not recommended family therapy.

16

Rhoda Schwindt's testimony was essentially the same as at the previous hearing. In addition to working with C.W., she had had approximately five sessions with R.W. as well. Schwindt testified R.W.'s foster parents had reported that R.W. told them Father had sexually abused him. Schwindt testified R.W. spoke specifically to her in a session about a time Father had sexually abused one of his friends, but R.W. had never disclosed to Schwindt that Father had sexually abused him.

Schwindt testified C.W. was angry, disruptive, and destructive, the intensity of which was concerning given his age, so Schwindt worked with him on modeling appropriate behavior. Schwindt testified C.W. exhibited signs of high levels of stress including stiff posture. Schwindt began to notice positive changes in C.W. in early 2013 after approximately a dozen visits. However, after C.W. had a visit with Father in the fall of 2013, he regressed. C.W. grew clingy with his foster parents and frantic if either parent had to leave and told therapists he was scared. Schwindt still saw C.W. every 6 weeks as of the termination hearing. Schwindt testified she did not know enough about the whole case to recommend placement for C.W.

Barry Plumlee's testimony was substantially similar to his previous testimony. He had been seeing R.W. since March 2013. R.W. told Plumlee he had been forced to have anal sex with Father. R.W. described details of the abuse, including the location, positions, and a descriptive detail about what Father had done to him. R.W. indicated the sexual abuse occurred on approximately 20 occasions. R.W. struggled to recall chronology, so was unable to provide a specific date of the encounters. Plumlee therefore recommended R.W. not have any contact with Father.

R.W. only provided details of the first specific instance of abuse and never changed any detail about it. R.W. also identified Ch.W. as someone who had hurt him. But R.W. was evasive about details of the encounters between R.W. and Ch.W. Plumlee believed R.W. Plumlee was unaware of whether R.W. had received a medical check up to

17

investigate the claims of anal penetration. Plumlee did not recommend family therapy based on the allegations of abuse against Father.

Mother testified she continued to live with Father and it was her intention to remain with Father even knowing she may not get C.W. back. Mother testified she clearly understood the consequence of her choice to remain with Father.

Cassie Lacrone testified she was a friend of Father and Mother. She had a home in Iola and stated that Father and R.W. had been at her home. The purpose of her testimony is unclear.

Father testified and denied ever staying at Lacrone's home. He testified he discussed Ch.W.'s and R.W.'s sexual behavior with their mother M.W.. in January 2007. Father alleged Ch.W. and R.W. knew about sex from watching M.W. having sex with other men. Father stated that Ch.W. told him that he and R.W. had to share a bedroom with their mother when they stayed with her and watched her have sex. Father said he confronted M.W. with Ch.W.'s allegations, and M.W. denied them. Father testified Ch.W. and R.W. referred to all of M.W.'s boyfriends as "dad."

In closing, the State focused on the sexual abuse allegations against Father by R.W. The State asked the district court to terminate Father's rights as to R.W. based on the claims of sexual abuse. The State argued it would never be in C.W.'s best interests to be with Father because of the abuse allegations by his brothers. Because Mother refused to leave Father, the State argued her rights should be terminated also.

The GAL focused on the future threat Father posed to his children and argued Father's behavior was unlikely to change in the foreseeable future. The GAL argued Mother's choice to stay with Father rendered her unfit as well.

18

Mother's attorney argued the only thing asked of her that Mother had not done was to "abandon her husband who she believe[d] . . . ha[d] not committed any sort of crime." Mother's attorney suggested it was "honestly unfair" to put Mother in the position of having to choose between her husband and her child. Mother was unfairly guilty by association with Father. Her attorney suggested the social services agencies did not do enough to reintegrate C.W. "once they got it in their head that [Father] was a bad man."

On March 11, 2015, the district court issued its order terminating Mother's and Father's parental rights as to Ch.W., R.W., and C.W. The court provided the background of the case and summarized the case planning involved. The only facts relevant to this appeal are the initial conference for Father and Mother on April 19, 2012, in which preliminary tasks were identified but not mentioned in the court's order (the case plan was not included in the record so the specific tasks are unknown) and the sixth conference held on May 5, 2013, when social service providers developed an adoption only case plan for C.W.

The district court found that "Mother failed to sufficiently comply with the substantive orders and case plan tasks." The court acknowledged Mother had completed the following tasks: obtain and maintain employment, maintain transportation, follow the agency discipline policy, implement a plan regarding Ch.W. and R.W. having access to and smoking cigarettes, stop making negative comments about M.W. in front of C.W. and R.W., and submit to and pass drug tests. The court acknowledged Mother partially completed the following tasks of attending individual therapy and couples counseling, maintain housing, and complete parenting classes. The court said Mother had failed to complete a parenting class for children ages 1-4.

The district court also summarized the family's history with DCF. The court made the following findings regarding prior adjudicated CINC cases: (1) C.W. had been adjudicated a CINC under K.S.A. 2014 Supp. 38-2202(d)(1) and (d)(2) in Allen County

19

District Court case No. 11-JC-30, and Mother and Father entered no contest stipulations. C.W. was placed in DCF custody on July 18, 2011, after Mother and Father filed PFAs against each other; (2) B.W. was adjudicated a CINC under K.S.A. 2014 Supp. 38-2202(d)(1) and (d)(2) in Bourbon County District Court case No. 08-JC-51, after Mother and Father entered no contest stipulations and relinquished their parental rights to B.W.; and (3) K.W. was adjudicated a CINC under K.S.A. 2014 Supp. 38-2202(d)(1) and (d)(2) in Bourbon County District Court case No. 08-JC-51 after Mother and Father entered no contest stipulations and relinquished their parental rights to K.W. Documentation of the previous adjudications was not included in the record on appeal, but the court took judicial notice of the cases.

The district court made the following findings regarding sexual abuse of the children by Father. The sexual abuse of Ch.W. and R.W. by Father was an "early and ongoing issue" in the case. Plumlee, R.W.'s therapist had recommended no contact with Father after R.W. "disclosed to him on more than one occasion details of sexual abuse by [Father]." Plumlee testified R.W. reported being afraid of Father. Plumlee testified he would have recommended family therapy but for the sexual abuse allegations. "'*But with what* [*R.W.*] *has told me in detail about what he says happened to him, I still wouldn't ever recommend* [family therapy]." Plumlee testified R.W. specifically identified Father. Plumlee testified R.W.'s demeanor would change when Father's name was mentioned. Schwindt, C.W.'s therapist, testified C.W. had exhibited inappropriate behavior for a child his age. Through therapy, C.W.'s behavior improved. However, a visit with Father caused a regression in C.W. and PTSD symptoms. Schwindt recommended no contact between Father and C.W.   Mother testified she believed Father was innocent.

The district court then determined two statutory presumptions of unfitness applied to Mother:  On two or more prior occasions a child in her physical custody had been adjudicated a CINC; and her child has been in out-of-home placement for more than a year under court order and she had substantially neglected or willfully refused to carry

20

out a reasonable plan, approved by the court, directed towards reintegration. The court also found Mother unfit due to conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature under K.S.A. 2014 Supp. 38-2269(b)(2); physical, mental, or emotional abuse or neglect, or sexual abuse of a child under K.S.A. 2014 Supp. 38-2269(b)(4); failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family under K.S.A. 2014 Supp. 38-2269(b)(7); and lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child under K.S.A. 2014 Supp. 38-2269(b)(8).

The district court then determined Mother was "an unfit parent by reason of conduct or condition that renders her unable to care properly for her children and the conduct or condition is unlikely to change in the foreseeable future." The court found the best interests of C.W.'s physical, mental, or emotional needs would be served by terminating the rights of Mother. The court terminated Mother's rights.

Mother brings this appeal.

Mother argues the district court erred in finding: (1) she was presumed to be unfit; (2) she was an unfit parent under K.S.A. 38-2269; and (3) that terminating her parental rights was in C.W.'s best interests.

When reviewing a district court's findings on unfitness, the standard of review is clear: The district court's findings must be supported by clear and convincing evidence. K.S.A. 2014 Supp. 38-2269(a). We must determine whether such evidence could have convinced a rational factfinder such facts were highly probable by clear and convincing evidence when viewed in the light most favorable to the State. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In making this determination, appellate courts do "not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705.

21

*Presumption of Unfitness*

In Kansas, a parent may be presumed unfit under K.S.A. 2014 Supp. 38-2271, the statute governing the presumption of unfitness. Relevant here, under K.S.A. 2014 Supp. 38-2271(a):

> "It is presumed in the manner provided in K.S.A. 60-414, and amendments thereto, that a parent is unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes, by clear and convincing evidence, that:
>
> . . . .
>
> (3) on two or more prior occasions a child in the physical custody of the parent has been adjudicated a child in need of care as defined by subsection (d)(1), (d)(3), (d)(5) or (d)(11) of K.S.A. 2014 Supp. 38-2202, and amendments thereto, or comparable proceedings under the laws of another jurisdiction;
>
> . . . .
>
> (5) the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home."

The parent carries the burden "to rebut the presumption of unfitness by a preponderance of the evidence." K.S.A. 2014 Supp. 38-2271(b). If the parent does not come forward with "proof that the parent is presently fit and able to care for the child or that the parent will be fit and able to care for the child in the foreseeable future, the court shall terminate parental rights in proceedings pursuant to K.S.A. 2014 Supp. 38-2266 *et seq*., and amendments thereto." K.S.A. 2014 Supp. 38-2271(b).

K.S.A. 60-414, which governs the effect of presumptions, provides:

"Subject to K.S.A. 60-416, and except for presumptions which are conclusive or irrefutable under the rules of law from which they arise, (a) if the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the nonexistence of the presumed fact is upon the party against whom the presumption operates; (b) if the facts from which the presumption arises have no probative value as evidence of the presumed fact, the presumption does not exist when evidence is introduced which would support a finding of the nonexistence of the presumed fact, and the fact which would otherwise be presumed shall be determined from the evidence exactly as if no presumption was or had ever been involved."

Mother argues (1) the district court failed to determine whether it was applying a K.S.A. 60-414(a) or K.S.A. 60-414(b) presumption, (2) there was insufficient evidence of the prior CINC adjudications because the record of the Bourbon County CINC cases relative to Mother was not included in the record, and (3) insufficient evidence exists that Mother had substantially or willfully refused to carry out a reasonable plan towards reintegration.

*Did the District Court Properly Apply the Presumption?*

Mother is correct—the district court order never mentions K.S.A. 60-414. And the State did not mention it in its motion for termination.

This court addressed a similar situation in *In re J.S.*, 42 Kan. App. 2d 113, 119, 208 P.3d 802, *rev. denied* 289 Kan. 1278 (2009). In *In re J.S.*, the district court had applied the presumption without addressing K.S.A. 60-414. The State had not moved to terminate rights based on the presumption of unfitness, so also did not mention K.S.A. 60-414. 42 Kan. App. 2d at 117-19. This court addressed the failure to discuss which presumption applied and held:

23

"Under *In re J.L.*, the district court's failure to consider K.S.A. 60-414 before applying the statutory presumption is error. See 20 Kan. App. 2d at 679-80, 891 P.2d 1125. Reversal is not required, however. Mother did not preserve this issue for appeal because she did not raise it before the district court. See *In re Marriage of Bradley*, 258 Kan. 39, Syl. ¶ 2, 899 P.2d 471 (1995) (when district court's findings are objectionable on grounds other than sufficiency of the evidence, an objection must be made to preserve the issue on appeal); K.S.A. 60-252; Supreme Court Rule 165 (2008 Kan. Ct. R. Annot. 235). Additionally, failure to consider K.S.A. 60-414 prior to applying the presumption of unfitness is a constitutional violation. *In re J.L.,* 20 Kan. App. 2d at 679-80. Constitutional grounds for reversal are not considered for the first time on appeal. *Miller v. Bartle*, 283 Kan. 108, 119, 150 P.3d 1282 (2007)." 42 Kan. App. 2d at 119.

Here, Mother did not raise this issue before the district court and therefore has failed to preserve the issue for appellate review.

Additionally, our Supreme Court recently reiterated that Kansas Supreme Court Rule 6.02(a)(5) (2014 Kan. Ct. R. Annot. 40) requires an appellant raising a constitutional issue for the first time on appeal to affirmatively invoke and argue an exception to that general rule. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). The court further reiterated that failure to satisfy Rule 6.02(a)(5) in this respect amounts to an abandonment of the constitution claim. 301 Kan. at 1044.

The record reveals that Mother did not object to the district court's application of the presumption without discussing K.S.A. 60-414. Therefore, Mother violated Supreme Court Rule 6.02(a)(5) by failing to explain in her brief why the issue is properly before this court. For this reason, the constitutional claim raised by Mother should be dismissed.

Even if the issue had been preserved for appeal, reversal would not necessarily be required. We note that the district court's decision terminating mother's parental rights was based on two grounds: application of the statutory presumption and the

24

determination that mother is unfit under K.S.A. 2014 Supp. 38-2269. If sufficient evidence exists to support the determination based on the statutory factors of unfitness, reversal would not be required.

*Was There Sufficient Evidence That on Two or More Prior Occasions, a Child in Mother's Custody Was Adjudicated a CINC?*

The district court took judicial notice of two previous CINC cases, 08-JC-51—the Bourbon County case in which B.W. and K.W. were adjudicated CINCs—and 11-JC-30—the previous Allen County case in which C.W. was first adjudicated a CINC. The State presented information regarding all three previous adjudications in its petition requesting that C.W. be adjudicated a CINC and in its petition requesting the termination of Mother's rights. In its petitions, the State did not specifically ask the court to take judicial notice of the case files, so the record is unclear on whether the State asked the court to take judicial notice of 08-JC-51 and 11-JC-30, or if the court did so on its own.

K.S.A. 60-409 governs facts that must or may be judicially noticed. A district court has the discretion to take judicial notice without the request of a party of "specific facts . . . which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." K.S.A. 60-409(b)(4). And, when a party requests the court to take judicial notice of a "matter specified in subsection (b)," the court "shall" take judicial notice of the fact if the party "(1) furnishes the judge sufficient information to enable him or her to properly comply with the request and (2) has given each adverse party such notice as the judge may require to enable the adverse party to prepare to meet the request." K.S.A. 60-409(c).

Kansas has long recognized that a court may take judicial notice of its own records. See *State v. Shelton*, 252 Kan. 319, 323-25, 845 P.2d 23 (1993); *State v. Barnett*,

25

3 Kan. 250, Syl. ¶ 2 (1865); *State v. Shaffer*, 14 Kan. App. 2d 282, Syl. ¶ 3, 788 P.2d 1341, *rev. denied* 246 Kan. 770 (1990).

Judicial notice takes the place of proof and is of equal force. *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 552, 431 P.2d 518 (1967).

Mother argues the alleged prior CINC adjudications were not even mentioned to the district court and no journal entries from the Bourbon County district court were ever admitted into evidence. However, the statutes governing the process of judicial notice do not require the State to present the district court with a journal entry. Instead, if the State had requested the court to take judicial notice, it only needed to provide the district court with "sufficient information." K.S.A. 60-409(c). The record also indicates Mother did not object to or challenge the district court order taking judicial notice of the previous CINC cases.

Judicial notice takes the place of the burden of proof, and the district court found by judicial notice on two or more prior occasions that Mother had a child in her custody adjudicated a CINC. This is clear and convincing evidence from which a rational factfinder could conclude Mother was presumptively unfit under K.S.A. 2014 Supp. 38-2271(a)(3).

*Was There Sufficient Evidence That Mother Had Substantially or Willfully Refused to Carry Out a Reasonable Plan Towards Reintegration?*

Mother argues that the "uncontroverted evidence was that [Mother] complied with all case plan tasks requested of her." However, the record reveals Mother was clearly made aware that, in spite of her success at completing her own tasks, if she remained with Father, she would likely lose custody of C.W. due to the sexual abuse allegations against Father. Mother's testimony from the termination hearing on the subject is revealing:

"[GAL]: . . . And you have heard the questions regarding placing [C.W.] back with you, and the recommendations are basically not to do so if [Father] continues to live with you; you understand that?

"[Mother]: Yes, I do.

"[GAL]: That has been explained to you many times?

"[Mother]: Yes.

"[GAL]: And you want [C.W.] to be placed with you?

"[Mother]: Yes.

"[Gal]: Are you and [Father] still together?

"[Mother]: Yes.

"[GAL]: Is it your intention to remain with [Father]?

"[Mother]: Yes.

"[GAL]: Even over knowing that you may not get [C.W.] back if [Father] continues to live with you?

"[Mother]: Yes.

. . . .

"[Prosecutor]: Do you understand that if the Court . . . terminates the parental rights of [Father] with regard to [Ch.W. and R.W.], that will create a presumption that he's unfit with regards to [C.W.] as well? . . .

"[Mother]: Yes.

"[Prosecutor]: So there is a presumption that [Father] would then be unfit as to [C.W.] as well?

"[Mother]: Yes.

"[Prosecutor]: And your position still is that you would rather stay with [Father] and risk not getting your son back?

"[Mother]: Yeah. Because I know—I know what's true.

. . . .

"[Prosecutor]: . . . I know you have been asked this question many times . . . You understand that if the Court severs parental rights of [Father] as to all . . . three children, there is no way you can get [C.W.] back if you stay with [Father]; do you understand that?

"[Mother]: Yes."

27

This is clear and convincing evidence that C.W. had remained out of the home for more than a year due to Mother's refusal to leave Father. As such, there was sufficient evidence to support the presumption of Mother's unfitness pursuant to K.S.A. 2014 Supp.38-2271(a)(5).

We must also deal with the question of whether clear and convincing evidence supports the district court's determination that Mother was unfit under K.S.A. 2014 Supp. 38-2269.

*Statutory Factors of Unfitness*

If a child is adjudicated a CINC, parental rights may be terminated "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2014 Supp. 38-2269(a). The Revised Kansas Code for Care of Children, K.S.A. 2014 Supp. 38-2201 *et seq.*, lists a number of nonexclusive factors the district court must consider in determining a parent's unfitness. See K.S.A. 2014 Supp. 38-2269(b) and (c). Any one of the factors "may, but does not necessarily, establish grounds" for terminating a parent's rights. K.S.A. 2014 Supp. 38-2269(f). The district court is not limited only to the statutory factors in making a determination of unfitness. K.S.A. 2014 Supp. 38-2269(b).

Here, the district court found Mother unfit for her refusal to separate from Father despite the allegations he had sexually abused R.W., satisfying the following factors: K.S.A. 2014 Supp. 38-2269(b)(2)—conduct toward a child of a physically, emotionally or sexually cruel or abusive nature; K.S.A. 2014 Supp. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of a child; K.S.A. 2014 Supp. 38-2269(b)(7)—failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; and K.S.A. 2014 Supp. 38-2269(b)(8)—lack of effort on the

28

part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

Next, we must determine whether clear and compelling evidence supports the termination of Mother's rights. The first step is to determine whether the district court's findings of unfitness were supported by clear and convincing evidence.

*K.S.A. 2014 Supp. 38-2269(b)(2)* and *K.S.A. 20145 Supp. 38-2269(b)(5)*

Mother argues the uncontroverted evidence reflects there were no allegations she was abusive towards C.W. in any way. Instead, Mother suggests the evidence reflects C.W. did well during visitation with her. Mother acknowledges that Kansas appellate courts have determined a parent's failure to protect a child from abuse constitutes conduct toward a child which is physically, emotionally, or sexually cruel or abusive in nature. However, she argues those cases are inapplicable since there have been no allegations that C.W. had been abused.

Kansas recognizes a natural and common-law duty to protect iys children from abuse. *In re S.D.*, 41 Kan. App. 2d 780, 788, 204 P.3d 1182 (2009) (citing *State v. Edgar*, 281 Kan. 47, 68, 127 P.3d 1016 [2006]). Our criminal statutes impose a duty on parents to protect their children from abuse as well. K.S.A. 2014 Supp. 21-5601(a)-(b) (child endangerment and aggravated child endangerment). Even when the parent whose rights are at issue was not implicated in the abuse suffered by a child, a parent may be held responsible for failing to take proper precautions to protect a child from abuse. *In re A.B.*, 12 Kan. App. 2d 391, 392, 746 P.2d 96 (1987). And a district court that observes the abuse of one child "should not be forced to refrain from taking action until the next child suffers injury." 12 Kan. App. 2d at 392.

29

Here, Mother had a duty to protect C.W. from abuse. R.W.'s therapist testified that R.W. had confided in him that Father had sexually molested him on multiple occasions and described a particular event in explicit detail. Plumlee testified R.W. never changed his story and consistently responded negatively to the mention of his Father. Plumlee believed R.W. and felt his allegations were credible.

Even though there were no allegations that Mother was the abuser or that C.W. was abused, Plumlee's testimony amounts to clear and convincing evidence that Father had sexually abused R.W. Additionally, Schwindt testified C.W. exhibited high levels of stress after a visit with Father. The record on appeal also refers to law enforcement involvement. However, for unknown reasons, none of the documentation is included in the record on appeal. Mother failed to heed the therapists' warnings that there should be no contact between Father and the children. Mother's refusal to leave Father in spite of the allegations was a failure on her part to protect C.W. from potential abuse. The district court did not need to wait for C.W. to suffer injury before taking action. See *In re A.B.*, 12 Kan. App. 2d at 392.

This court recently addressed a mother whose rights were terminated by the district court due to her violations of a no-contact order with a boyfriend in *In re D.M.*, No. 112,445, 2015 WL 2414508, at *5 (Kan. App. 2015) (unpublished opinion). In *In re D.M.*, this court noted there was certainly evidence in the record establishing that mother and her boyfriend quarreled, but the record did not establish that the boyfriend was physically abusive. 2015 WL 2414508, at *6. This court reversed the termination of the mother's parental rights and held:

> "The district court found that Mother continuously violated the no-contact order with B.W., that she knew she was violating the order, and that she knew or should have known that her continued involvement with B.W. would result in the removal of her children, thereby neglecting their emotional health and needs. More is required because

30

there is no evidence equating Mother's violation of the no-contact order with abuse of the children." 2015 WL 2414508, at *5.

However, the *In re D.M.* court noted: "Had the evidence directly established that [the boyfriend] was abusive toward Mother or the children, our decision would be different." 2015 WL 2414508, at *7.

Mother's case seems to present the facts absent in *In re D.M.*—here the evidence did establish that Father was sexually abusive towards R.W. Though Mother was not under court order to stay away from Father, the court had ordered no contact between Father and C.W. Her refusal to leave Father would have had the effect of refusing to abide by the court's order that the children have no contact with Father. Mother remained steadfastly loyal to him despite evidence he was abusive towards the children.

Based on these facts, and in spite of Mother's contention that Father was innocent, a rational factfinder could have found it highly probable that Mother's decision to remain with Father in spite of the allegations of sexual abuse against him, and thus subject C.W. to the possibility of suffering the same abuse, was conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature.

*K.S.A. 2014 Supp. 38-2269(b)(7)*

Mother argues that the failure of reasonable efforts made by the social services agencies to rehabilitate her family "falls squarely on the State and cannot be attributed to [Mother]." She argues the efforts failed because the State failed to seek family counseling. Because the State never sought family counseling, it was allegedly the State's fault the family was not rehabilitated.

31

Mother, as the party asserting the error, carries the burden to provide a record which affirmatively shows prejudicial error. *State v. Goodson*, 281 Kan. 913, 919, 135 P.3d 1116 (2006); *State v. Duncan*, 44 Kan. App. 2d 1029, 1039, 242 P.3d 1271 (2010).

K.S.A. 2014 Supp. 38-2269(b)(7) provides that when determining the fitness of a parent, one of the factors the court may consider is the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." This clearly imposes an obligation on the relevant agencies to expend reasonable efforts towards reintegrating the child with her parents by correcting the conduct and condition that resulted in the removal of the child. See K.S.A. 2014 Supp. 38-2201(b)(8) (citing as a goal of the Code the provision of "preventative and rehabilitation services, when appropriate, to abused and neglected children and their families so, if possible, the families can remain together without further threat to the children"). The statutes governing unfitness determination, however, do not require proof that the appropriate agencies made a herculean effort to lead the parent through the responsibilities of the reintegration plan. See *In re J.R.*, No. 104,975, 2011 WL 2175953, at *6 (Kan. App. 2011) (unpublished opinion); *In re B.K.S., Jr.*, No. 95,297, 2006 WL 2443937 at *2 (Kan. App. 2006) (unpublished opinion).

Here, the record does not include documentation from the social service providers detailing the services provided to the family. As such, Mother failed to provide a record that would allow meaningful review of the issue. Without documentation such as the termination summary admitted at trial, this court does not have evidence of the efforts provided by the social services providers. However, the testimony from the permanency hearing and termination hearing indicates the children received therapy, social service providers visited Mother's home and made recommendations for the home to meet DCF guidelines, and social services providers provided the court-ordered supervision of visits. Mother does not allege these services were independently insufficient. Instead, Mother only asserts the failure to rehabilitate cannot be attributed to her because of the lack of family therapy ordered.

Here, the district court left therapy to the discretion of the children's therapists. Plumlee unequivocally testified that he would not recommend family therapy based on the sexual abuse allegations against Father. Schwindt also testified C.W. had a negative response to a visit with Father. Certainly social service providers and the State should not be faulted for following the recommendation of therapists who are basing their recommendations on credible reports of sexual abuse and personally observed negative reactions to the presence of a parent. And in every case when viewed through the distorting lens of hindsight, it can likely be said that a little bit more could have been done or should have been done. But the mere fact that the service providers did not provide a single service—family therapy—does not negate the reasonable efforts that were made for the benefit of the family.

Despite the social services providers' assistance, Mother continued to refuse to leave Father. Mother does not suggest how family therapy would have resolved the issues stemming from the sexual abuse allegations against Father, or even acknowledge Plumlee's testimony that he adamantly refused to recommend family therapy based on R.W.'s reports of sexual abuse. Instead, she only attacks the failure of the providers to offer her family therapy.

These facts are facts from which a rational factfinder could conclude that the social service providers did not act unreasonably when they failed to order family therapy.

*K.S.A. 2014 Supp. 38-2269(b)(8)*

Mother very briefly argues the uncontroverted evidence was that she completed every task assigned to her. Mother alleges the district court did not give her credit for completing a parenting class for children aged 1-4 years old. But the record on appeal

33

includes a certificate indicating she did actually complete this course. Even assuming the certificate is valid, any error the district court made when it found she failed to complete this class would have been harmless. See *State v. Ward*, 292 Kan. 541, 552-65, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (an error that did not affect a party's substantial rights, meaning it will not affect the outcome, is harmless). For the reasons discussed below, this court should affirm the termination of Mother's parental rights regardless of whether she completed this parenting class.

Mother contends the only reason her rights were terminated was because she refused to leave Father. Mother suggests this was an erroneous decision because "the allegations of sexual abuse against [Father] had been unsubstantiated and [Father] had not been found unfit and his parental rights were still intact." Mother's argument only emphasizes facts that support her position. She claims that the sexual abuse allegations are unsubstantiated. On July 2, 2012, DCF investigated the sexual abuse allegations and could not find clear and convincing evidence of sexual abuse of either Ch.W. or R.W. However, Plumlee began seeing R.W. in March 2013. R.W. continued to report abuse, and Plumlee found the report credible. Even though DCF could not substantiate the claim in July 2012, this does not mean the abuse did not happen, especially in light of Plumlee's testimony.

Additionally, Father's rights to Ch.W., R.W., and C.W. were terminated on March 11, 2015, based on the sexual abuse allegations. Because the district court found the allegations of abuse credible, it did not need to wait to terminate Mother's rights until after it terminated Father's rights, considering Mother's unequivocal testimony that she would not leave Father.

Based on these facts, a rational factfinder could conclude that Mother failed to adjust her circumstances, conduct, or conditions to meet C.W.'s needs.

34

Mother does not challenge the district court's determination that the conduct and conditions causing her unfitness were unlikely to change. See K.S.A. 2014 Supp. 38-2269(a). Therefore, Mother has abandoned this claim. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011) (an issue not briefed by the appellant is deemed waived and abandoned).

However, a court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Moreover, the term foreseeable future is measured from the child's perspective and takes into account a child's perception of time. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). This court has considered periods of time as short as 7 months to be the foreseeable future from a child's perspective. 41 Kan. App. 2d at 790. Here, C.W.'s case had been ongoing for nearly 3 years. Mother had made remarkable progress with many of the tasks assigned to her, but her testimony revealed she would not leave Father despite the fact that she knew it might mean she would lose C.W.

Based on this evidence, the district court could conclude that it was highly probable that Mother would remain with Father and would therefore be unable to care for C.W., in the foreseeable future.

Finally, Mother argues the district court's finding that terminating her rights was in C.W.'s best interests under K.S.A. 2014 Supp. 38-2269(g)(1) was incorrect.

Because it hears the evidence directly, the district court is in the best position to determine the best interests of the child, and an appellate court cannot overturn it without finding an abuse of discretion. See *In re Marriage of Rayman*, 273 Kan. 996, 999, 47 P.3d 413 (2002); *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* 291 Kan. 912 (2010). An abuse of discretion occurs when the district court acts in an unreasonable, fanciful, or arbitrary manner, or when the court bases its decision on an

error of fact or an error of law. *Northern Natural Gas Co. v. ONEOK Field Services, Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

First, it is worth noting that the case Mother cites in support of her argument, *In re K.R.*, 43 Kan. App. 2d 891, 905, 233 P.3d 746 (2010), is distinguishable. In *In re K.R.*, the district court failed to even consider whether termination was in the best interests of the children. This court reversed the termination of Mother's rights based on the district court's failure to satisfy K.S.A. 2009 Supp. 38-2269(g)(1), which required the court to determine whether termination was in the child's best interests. 43 Kan. App. 2d at 43.

The district court clearly found Plumlee's testimony, and therefore R.W.'s allegations of abuse, credible. It was not an abuse of discretion for the court to determine it was in C.W.'s best interests to terminate Mother's rights when she refused to leave Father in spite of the allegations.

Ultimately, the evidence provided throughout the pendency of this case demonstrated that Mother made significant efforts to complete the tasks assigned to her. But the one thing she would not do—leave Father—posed the greatest potential risk to C.W. and rendered her unable to adequately meet his needs in the future. The district court's decision to terminate Mother's rights was supported by clear and convincing evidence.

Affirmed.